*In re* APPORTIONMENT OF STATE LEGISLATURE—1965.

BADGLEY *v.* SECRETARY OF STATE.

DECISION OF THE COURT.

1. STATES—REMAND TO COMMISSION ON LEGISLATIVE APPORTIONMENT.
   Matter of apportionment of the State legislature is remanded to commission on legislative apportionment for completion of work within 60 days, and in event of another deadlock to report same with petition for further mandatory order (Const 1963, art 4).

SEPARATE OPINION.

DETHMERS and KELLY, JJ.

2. STATES—APPORTIONMENT OF LEGISLATURE—GERRYMANDERING.
   *The plan provided in the Constitution for the apportionment of the legislature was intended to make gerrymandering most difficult, since the apportionment required by the Constitution included adherence to county, city, and township boundaries, rectangular, or nearly uniform, or square shape, it not being assumed that members of the apportionment commission would consider the welfare of the party above the welfare of the voter or the State (Const 1963, art 4).*

3. SAME—LEGISLATURE—GERRYMANDERING.
   *Gerrymandering of the legislature is an admittedly immoral, unfair, or sharp practice which, if ascertained to exist, should not be condoned by the Supreme Court (Const 1963, art 4).*

REFERENCES FOR POINTS IN HEADNOTES
[1–4, 6, 7, 9, 11–17, 19, 20, 22–24, 26–37, 41–46, 48] 18 Am Jur, Elections §§ 16–19, 24.
   Inequality of population or lack of compactness of territory as invalidating apportionment of representatives. 2 ALR 1337.
[5, 8] 17 Am Jur, Discovery and Inspection § 6.
[10] 20 Am Jur 2d, Courts §§ 214, 226.
[18, 38–40] 16 Am Jur 2d, Constitutional Law § 181 *et seq.*
[21] 20 Am Jur 2d, Courts § 183 *et seq.*
[25, 47] 5 Am Jur 2d, Appeal and Error § 1009 *et seq.*

4. SAME—APPORTIONMENT OF LEGISLATURE—DEPOSITIONS.

*Offer to prove various specific legislative districts had been so arranged by crossing county and city lines as to favor one political party held, to establish that request to take depositions of appropriate witnesses, including members of the commission on legislative apportionment, had substantial reason for allowing depositions to be taken, and was not solely the result of conjecture, hindsight, and circular reasoning (GCR 1963, 302.4 [2]).*

5. DISCOVERY—PURPOSE—TRIAL.

*This State is committed to a liberal use of discovery procedure before trial, thereby enabling the fulfillment of the public purpose of reducing the time of the trial by narrowing the issues, obtaining admissions of fact, fixing the claims of the parties when the incidents are fresh in their minds and otherwise fostering accuracy and celerity of trial (GCR 1963, 302.4 [2]).*

6. STATES—APPORTIONMENT OF LEGISLATURE—POLITICAL ADVANTAGE.

*The mere division of the State into legislative districts of equal population does not and would not condone, justify, or excuse a method or system where, by the use of previous election results, districts can be formed giving one political party advantage over the other (Const 1963, art 4).*

7. SAME—APPORTIONMENT OF LEGISLATURE—INTENT.

*Whether the apportionment of the legislature was done in such a way as to effect a malapportionment by reason of gerrymandering on an improper basis is the ultimate test of the validity, not what was the professed intentions or motivations of 1 or more of the members of the commission on legislative apportionment (Const 1963, art 4).*

8. SAME—APPORTIONMENT OF LEGISLATURE—DISCOVERY.

*The right to discovery in proceeding raising issue of validity of plan of legislative apportionment is accorded, where plan previously adopted had never received a majority vote of approval of the commission on legislative apportionment, nor a unanimous vote of approval of the Supreme Court, the plan was given unusual, hasty, and brief consideration because of pending elections, the right to discovery is presumed to be invoked in good faith and the possibility of abuse does not warrant inhibition of the right (GCR 1963, 302.4[2]).*

9. SAME—COMMISSION ON LEGISLATIVE APPORTIONMENT—JURISDICTION OF SUPREME COURT—DISCOVERY.

*Commission on legislative apportionment is ordered to reconvene and make a new effort to reapportion the legislature for the*

next biennial election, the Supreme Court retaining jurisdiction of the matter, including the matter of discovery (Const 1908, art 4, §§ 1-6; GCR 1963, 302.4[2]).

SEPARATE OPINION.

BLACK, J.

10. COURTS—CONSTITUTIONAL LAW.
   *The Supreme Court is bound to serve both the Constitution of the State and the Constitution of the United States.*

11. STATES—COMMISSION ON LEGISLATIVE APPORTIONMENT.
   *The commission on legislative apportionment has the duty to effect the districting and apportionment of the legislature for the remainder of the decennium, such action as has been taken hitherto having been provisional (Const 1963, art 4, § 6).*

12. SAME—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT.
   *The task of the Supreme Court in the matter of legislative apportionment is limited to supervision and direction to the commission on legislative apportionment in accordance with constitutional requirements insofar as plans for apportionment emerge from and are adopted by the commission (Const 1963, art 4, § 6).*

13. SAME—APPORTIONMENT OF LEGISLATURE—JURISDICTION OF SUPREME COURT—REVIEW FOR ELECTOR.
   *Original jurisdiction is conferred upon the Supreme Court by the Constitution in the matter of reviewing a plan for legislative apportionment upon application by an elector, a judicial proceeding attended by broad equitable powers (Const 1963, art 4 § 6).*

14. SAME—COMMISSION ON LEGISLATIVE APPORTIONMENT—DEADLOCK —SUPREME COURT.
   *The not completed, but exclusive, task of the commission on legislative apportionment to district and apportion the 2 houses of the legislature for the remainder of the current decennium may not be usurped by the Supreme Court, but the Court may properly instruct the commission to proceed according to ascertainable and applicable constitutional requirements pursuant to procedure exacted by section of Constitution setting up the commission, and if another deadlock continues beyond 60-day period allowed the commission, it is to petition for instructions for breaking the deadlock by lot, jurisdiction being retained until a final plan is reviewed by the Supreme Court and found*

*consonant with constitutional requirements (US Const, art 6; Mich Const 1963, art 1, § 1, art 4, § 6).*

15. SAME—APPORTIONMENT OF LEGISLATURE—APPROVAL OF PLAN.

*A plan of apportionment of the legislature that has not received approval by a majority of the commission on legislative apportionment is not a final plan subject to review by the Supreme Court in a proceeding initiated by an elector (Const 1963, art 4, § 6).*

16. SAME—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW— MOOT QUESTION.

*The question of constitutionality of plan of apportionment of the legislature which the Supreme Court directed the commission on legislative apportionment to adopt for use in the 1964 elections has become moot, where such plan was adopted pursuant to provisional action taken and a majority of members of the commission have not approved the plan, there being no final plan adopted for use during the balance of the decennium (Const 1963, art 4, § 6).*

17. SAME—COMMISSION ON LEGISLATIVE APPORTIONMENT.

*A Constitution may validly provide for an appointed commission, rather than the legislature, regularly to district and apportion the legislature (Const 1963, art 4, § 6).*

18. CONSTITUTIONAL LAW—SEVERABILITY—UTTERANCES OF DELEGATES.

*The question of severability of a provision of the Constitution is dependent upon the action of the people, not the fragmented and abstruse utterances of delegates at the constitutional convention.*

19. SAME—COMMISSION ON LEGISLATIVE APPORTIONMENT—SEVERABIL- ITY OF SECTIONS.

*Provision of Constitution setting up the commission on legisla- tive apportionment held, fully operable as long as there remain in the Constitution the provisions vesting the legislative power in the bicameral legislature with the 38-member senate elected for 4 years and a 110-member house elected for 2 years ap- portioned on a basis of population into single-member districts consisting of compact and convenient territory contiguous by land (Const 1963, art 4, §§ 1-3, 6).*

20. STATES—APPORTIONMENT OF LEGISLATURE.

*Whether the commission on legislative apportionment shall dis- trict and apportion the legislature or whether the legislature shall perform that task is a political question, not a matter of constitutional interpretation (Const 1963, art 4, § 6).*

21. Courts—Jurisdiction.

*The limitations of existing precedent do not circumscribe a court vested with unique jurisdiction in the governmental structure.*

22. States—Apportionment of Legislature.

*Order directing commission on legislative apportionment to adopt a designated plan of legislative apportionment for the 1964 elections held, conditional in order to comply with the mandate of the Supreme Court of the United States that both houses of the legislature be apportioned as nearly as possible on an equal population basis with very brief and insufficient time allowed for challenge thereof to comply with other permissible standards set forth in State Constitution (Const 1963, art 4, § 6).*

23. Same—Apportionment of Legislature—Guidelines of Constitution.

*Voter-expressed guidelines in Constitution for districting and apportioning the legislature by respecting the geographic integrity of existing senatorial districts, that single-member representative districts be compact, contiguous, and as nearly square in shape as possible, and that multi-county representative areas be divided into single-member districts as equal as possible in population but adhering to county lines should be considered, although subordinate to the basic equality of population factor required by the Supreme Court of the United States (Const 1963, art 4, §§ 1–6).*

24. Same—Apportionment of Legislature—Remand to Commission.

*Hitherto conditionally-approved plan of apportionment of the legislature is ordered remanded to the commission on legislative apportionment for further consideration of it or other plans in the light of guidelines set forth in the Constitution for a period of 60 days, when, if no agreement has been reached by the commission, all plans are to be resubmitted to the Supreme Court for further action, all without prejudice to ultimate disposition of pending petition to review the conditionally-approved plan (Const 1963, art 4).*

25. Costs—Apportionment of Legislature—Remand to Commission.

*No costs are allowed in elector's proceeding to review legislative apportionment plan, where matter is remanded to commission*

*on legislative apportionment for further consideration (Const 1963, art 4, §§ 1–6).*

Separate Opinion.

Adams, J.

26. States—Apportionment of Legislature—Consideration of Plan by Commission.

*The entire commission on legislative apportionment should be afforded an opportunity to consider the standards and guidelines furnished by the Supreme Court of the United States and to devise the best plan it can, where plan ordered adopted by the State Supreme Court had not been given sufficient opportunity for consideration by the commission (Const 1963, art 4).*

27. Same—Apportionment of Legislature—Population and Other Standards.

*A State must consider population as a controlling guideline in the apportionment of seats in both houses of the State legislature, but it may also maintain the integrity of various political subdivisions, insofar as possible, and provide for compact and contiguous territory in designing a scheme of apportionment (Const 1963, art 4).*

28. Same—Apportionment of Legislature—Gerrymandering.

*A State may forbid political gerrymandering in the plan of apportionment of the legislature and provide for districts that are compact, contiguous, and rectangular to achieve that end (Const 1963, art 4).*

29. Same—Apportionment of Legislature—Population and Other Standards—Gerrymandering.

*The fact that a formula for apportionment of the legislature has been declared invalid because it is not primarily based on equal population in legislative districts does not destroy or prevent application of other standards set forth that are designed to forbid or restrict, where possible, the undesirable practice of political gerrymandering (Const 1963, art 4).*

Dissenting Opinion.

Souris, J.

30. Constitutional Law—Equal Protection—Apportionment of Legislature.

*The sections of the article of the Constitution relative to apportionment of the legislative branch of the State government ex-*

*cept provisions vesting legislative power in a 38-member senate and a 110-member house of representatives, each from single-member districts, and prescribing their terms of office held, invalid as a violation of the equal protection clause of the Constitution of the United States (US Const, Am 14; Mich Const 1963, art 4, §§ 1-6).*

31. States—Apportionment of Legislature—Invalid Commission.

*The commission on legislative apportionment as established by the Constitution does not survive as a valid agency, since it is inconceivable that the people would have intended, in adopting the Constitution, to permit such a commission, neither elected by the people nor selected by any of its elected representatives, but instead, chosen by political parties on an area basis to apportion the legislature except as it was rigidly restricted by procedural formulae which the Supreme Court subsequently found to violate the equal protection clause of the Constitution of the United States (US Const, Am 14; Mich Const 1963, art 4).*

32. Constitutional Law—Apportionment of Legislature—Supreme Court—Equity.

*The Supreme Court, in the exercise of its general equitable powers, has jurisdiction to provide a provisional legislative apportionment in the absence of valid provision therefor by the Constitution or the legislature itself.*

33. States—Apportionment of Legislature—Gerrymander.

*Claim that plan of legislative apportionment directed by the Supreme Court to be adopted comprises a political gerrymander need not be considered by the Supreme Court since action then taken did not commit the Court to further judicial decree of use of the plan in future elections in the event appropriate statutory action or constitutional amendment were not accomplished.*

Dissenting Opinion.

T. M. Kavanagh, C. J., and Smith, J.

34. States—Apportionment of Legislature—Remand of Plan to Commission by Supreme Court.

*A remand of a plan of apportionment of the legislature to the commission on legislative apportionment is required only if the Supreme Court first finds that the plan previously adopted fails to comply with constitutional requirements (Const 1963, art 4, § 6).*

35. SAME—APPORTIONMENT OF LEGISLATURE—PRESUMPTION OF CONSTITUTIONALITY.

*A plan of apportionment of the legislature ordered adopted by the Supreme Court is presumed to be constitutional, especially where adoption followed months of study of various plans by the commission on legislative apportionment and the Supreme Court (Const 1963, art 4, § 6).*

36. SAME—APPORTIONMENT OF LEGISLATURE—REVIEW OF PLAN—PLEADING—BURDEN OF PROOF.

*The petition of the party seeking review of plan of legislative apportionment ordered adopted by the Supreme Court must allege facts plainly showing the plan to be unconstitutional and such party has the burden of proof to show unconstitutionality (Const 1963, art 4, § 6).*

37. SAME—APPORTIONMENT OF LEGISLATURE—GERRYMANDERING.

*Claim that plan of apportionment of the legislature was gerrymandered for partisan purposes* held, *an insufficient basis for determination that plan was invalid (Const 1963, art 4, § 6).*

38. CONSTITUTIONAL LAW—SEVERABILITY.

*Severability of provisions of a State Constitution is a State, not a Federal, question.*

39. SAME—SEVERABILITY—APPORTIONMENT OF LEGISLATURE.

*None of the various provisions of formulae for determining method by which commission on legislative apportionment should devise plan of apportionment may survive holding of unconstitutionality of .7% moiety provision for house districts and 80% population and 20% area factors for senate districts, since provisions requiring adherence to county and other political subdivision boundary lines, division of counties into classes, use of method of equal proportions in subdividing counties entitled to more than 1 legislator, the preservation of existing senatorial districts at time of reapportionment, requirements of compactness, contiguity, convenience and uniformity of shape are interdependent and not severable parts of the formulae and not intended to be operable separately (US Const, Am 14; Mich Const 1963, art 4, §§ 1-6).*

40. SAME—CONSTRUCTION—SEVERABILITY.

*A constitution may not be so construed that where provisions of key significance are found invalid under the Constitution of the United States, following the remaining provisions would operate to defeat the intent of the framers and adopters.*

41. STATES—APPORTIONMENT OF LEGISLATURE—POPULATION.

*Both houses of a State legislature must be apportioned on a population basis with all districts of equal population, as nearly as practicable (US Const, Am 14; Mich Const 1963, art 4).*

42. SAME—APPORTIONMENT OF LEGISLATURE.

*The application of various standards in permissible deviation from the equal population principle in districting and apportioning the legislature is within the province of the people in amending the Constitution rather than the Supreme Court or the commission on legislative apportionment (US Const, Am 14; Mich Const 1963, art 4, §§ 1–6).*

43. SAME—APPORTIONMENT OF LEGISLATURE—POPULATION AND OTHER STANDARDS.

*Plan of apportionment of the legislature as ordered to be adopted by the Supreme Court, which followed mandate of the Supreme Court of the United States in that districts in each house of the legislature have as nearly equal a population as possible and observed other common-sense standards of compactness, contiguity, regularity, and boundary-following held, in conformity with requirements of the Constitution (Const 1963, art 4, §§ 1–6).*

44. SAME—GERRYMANDERING.

*Partisan gerrymandering of legislative districts has not been condemned as unconstitutional by the Supreme Court of the United States, no Federal question having been found to be presented thereby.*

45. SAME—APPORTIONMENT OF LEGISLATURE—GERRYMANDERING.

*The development of antigerrymandering standards in a rational scheme of apportionment of a State legislature is not a matter within the province of the Supreme Court.*

46. SAME—APPORTIONMENT OF LEGISLATURE—SUPREME COURT—CONSTITUTIONAL LAW.

*Plan of apportionment of legislature as ordered adopted by Supreme Court after several months of examination of criteria for various plans and immediately following limiting decisions of the supreme court of the United States held, not provisional, since it most accurately complied with constitutional requirements (US Const, Am 14; Mich Const 1963, art 4).*

47. COSTS—APPORTIONMENT OF LEGISLATURE—DISMISSAL OF PETITION.

*No costs are allowed upon dismissal of electors' petition to review plan of apportionment of legislature which Supreme Court had ordered commission on legislative apportionment to adopt after*

*majority of commission had failed to agree upon any plan (Const 1963, art 4, § 6).*

SUPPLEMENTAL OPINION.

BLACK, J.

48. STATES—REMAND OF LEGISLATIVE APPORTIONMENT PLAN.

*Remand of plan of legislative apportionment to the apportionment commission is due and proper only when the commission has, by its own independent action, adopted a final plan, such plan has been brought before the Supreme Court in pursuance of original proceedings, and the plan has been found by the Supreme Court as failing to comply with constitutional requirements (Const 1963, art 4, § 6).*

Original petition in Supreme Court filed in accordance with article 4, section 6 of the Constitution of 1963 by Maxwell F. Badgley and 33 others to review the apportionment scheme for the State legislature, adopted June 22, 1964, commonly called the Austin-Kleiner alternate plan. Order entered designating the Secretary of State a party defendant and allowing plaintiffs to depose the commission on legislative apportionment and to discover all documentary evidence submitted to the commission. Motion by August Scholle and others to intervene as party defendants granted. On motion to reconsider, order granting discovery rescinded. Plaintiffs move for reconsideration and present an offer of proof to permit discovery. Submitted May 11, 1965. (Calendar No. 19, Docket No. 50,999.) Cause remanded to commission November 2, 1965. Supplemental opinion filed November 20, 1965.

*Dykema, Wheat, Spencer, Goodnow & Trigg (Nathan B. Goodnow* and *James D. Tracy,* of counsel), for plaintiffs.

*Frank J. Kelley,* Attorney General, and *Robert A. Derengoski,* Solicitor General, for defendant Secretary of State.

*Rothe, Marston, Mazey, Sachs & O'Connell (Theodore Sachs,* of counsel), for intervenor defendants.

KELLY, J. (*for remand to commission*). Under the provisions of article 4, § 6, of the Constitution of 1963, petitioners filed their "petition for review" requesting that this Court: (1) review the Austin-Kleiner plan which, pursuant to this Court's order, was adopted by the commission on legislative apportionment June 23, 1964,[1] and under which plan the 1964 legislative elections were subsequently held; (2) authorize petitioners to take depositions of appropriate witnesses, including the members of the commission on legislative apportionment; (3) conduct a hearing in open court with opportunity for oral argument; (4) declare the plan in violation of the cited provisions of the Michigan Constitution of 1963 and the Constitution of the United States, and take the following action:

(a) Rescind the order of this Court dated June 22, 1964, and declare the plan void and of no effect, for any elections subsequent to the primary and general elections of 1964;

(b) Remand the plan to the commission and order that the commission prepare and adopt a new apportionment plan which complies with the requirements of the Michigan Constitution of 1963, interpreted in the light of the constitutional requirements and guidelines established by applicable decisions of the Supreme Court of the United States.

On January 14, 1965, this Court denied petitioners' motion for discovery. February 5, 1965, motion for reconsideration having been filed, this Court entered an order scheduling the cause for oral argument on May 11, 1965, and amending the January 14, 1965, order, as follows:

"Whether, and if so to what extent, petitioners' offer of proof should be granted and proof taken,

---

[1] See PA 1964, pp 603–619.—REPORTER.

may be briefed and will be decided after oral argument has been completed and considered."

Oral argument was held on May 11, 1965, and subsequent to said argument intervenors filed a rejoinder brief on June 21, 1965, and petitioners a surrejoinder brief on July 22, 1965.

The first question to be answered is: Should petitioners' offer of proof be granted and proofs ordered taken?

Defendants oppose petitioners' request, claiming: (1) "Petitioners' charge of political gerrymander approaches naivete" and, when the Con-Con[2] records are considered, "the present allegations of partisan gerrymandering are curious, to say the least"; (2) "This Court should not presume to 'outrun' the United States Supreme Court in formulating rules which the Supreme Court to date has declined to make"; (3) The petition is a "plea to engage in a fishing expedition"; (4) If this Court follows previous decisions of this Court the petition for discovery will be denied; (5) The disputed questions do not meet the test of relevancy and competency and the "intentions or motivations" of the commissioners are immaterial.

*Defendants' objection (1):* Minimizing the charge of gerrymandering, defendant Secretary of State Hare states:

"Petitioners' charge of political gerrymander approaches naivete when it is considered that under Constitutional mandate the apportionment commission must be composed of four Democrats and four Republicans. Const 1963, art 4, § 6. It being constitutionally required that the commission be selected by the political parties, it would seem implicit that partisan political considerations enter into any product of the commission. If petitioners are on

---

[2] Constitutional Convention, 1961.—Reporter.

sound ground in contending that an unlawful parti-
san gerrymander is in the Austin-Kleiner plan, then
perhaps the apportionment commission itself must
fall as being a built-in gerrymandering device."

Intervening defendants, carrying forward defend-
ant Hare's thought that we should expect and not
be surprised with gerrymandering tactics, state:
"The present allegations of partisan gerrymandering
are curious, to say the least. The Con-Con records
reveal some interesting things, however, which do not
square with the present expressions of horror," and,
to sustain their point, quote, among others, Consti-
tutional Convention Delegate and Committee Chair-
man John Hannah, as follows:

"Mr. Chairman, members of the committee, I only
want to reiterate the point that Judge Dehnke has
made. This is a matter that received long and care-
ful consideration by the committee. The committee
felt very strongly that this apportionment commis-
sion should be, as he indicated, persons with strong
political feelings, selected by the two political parties
to do this specific job. * * *

"The State is divided into four districts and each
party would select one member of the commission
from each of the four districts. The reason for that
is: in the view of our committee it is desirable that
this commission first of all be partisan; secondly,
that it be reasonably objective; and thirdly, that it
have some knowledge of all of the areas of the State
for which it is going to be responsible for drawing
new district lines."[3]

*Defendants' objection (2):* Defendant Hare
stresses the point under the heading "Austin-Kleiner
contains no *unlawful* gerrymander" (emphasis ours),
and states:

---

[3] Official record, 2 Constitutional Convention 1961, pp 2027, 2800.—
REPORTER.

"Since early in the last century when Governor Gerry was accused of devising legislative districts to accommodate his political needs, the lawfulness of such a practice has been debated. To this date no court has decreed that *per se* such an alignment of election districts is unlawful."

Intervenors also stress this point as follows:

"Whatever the Con-Con history, it is revealing that plaintiffs cite no precedent for the proposition that partisan gerrymandering, if proved, would constitute a violation of the Federal Constitution. Clearly, the courts have declined to so hold. * * *

"Clearly there is no basis for a conclusion that gerrymandering constitutes a Federal cause of action. What standards would be controlling are not remotely suggested by plaintiffs. No definitions are suggested. * * *

"This Court should not presume to 'outrun' the United States Supreme Court in formulating rules which the Supreme Court to date has declined to make."

*Defendants' objection (3):* Claiming petitioners endeavor to engage in a "fishing expedition," intervening defendants set forth petitioners' claims under the heading "Alleged 'Facts,'" as follows:

"Building surmise upon conjecture and sprinkling both with liberal doses of hindsight and circular reasoning (*e.g.*, the Democrats won so they must have gerrymandered; they gerrymandered to win), plaintiffs would 'prove' an unlawful partisan gerrymandering.

"Plaintiffs scarcely bother to define the term—and since they deal without precedent, it is no wonder they do not.

"Essentially however, the 'factual' grievances appear to be three (1) the Democrats won the legislature—handily; (2) some Republican incumbents

were obliged to run against others in the primary; and (3) certain districts are irregularly shaped. Further allegations suggest a combination of these elements."

*Defendants' objection (4):* Defendants call to this Court's attention four of our recent decisions, claiming that if we follow same it will result in a rejection of the petition for discovery. A resume of the facts involved in those four cases and the holdings of this court follow:

*Insealator, Inc.,* v. *Wallace,* 357 Mich 233. This appeal involved the claim of a manufacturer's agent that the corporation not only refused to pay him commission but altered its books to disguise the fact it owed him the claimed amount.

In our decision, after calling attention to the fact that Court Rule No 35, § 6 (1945),[4] provided that the deposition of an officer of a corporation "may be used by an adverse party for any purpose," we held (pp 252, 253):

"The court offered to go through the depositions and make a ruling as to the admissibility of testimony therein. Insealator insisted that they should be admitted in their entirety under this rule. The court properly ruled them out on objection to the effect that they contained irrelevant and immaterial testimony. Opportunity was afforded counsel to use them to contradict or impeach. This counsel apparently did not care to do. No error exists by reason of their exclusion under these circumstances."

*Banaszkiewicz* v. *Baun,* 359 Mich 109. This appeal involved a suit for specific performance of an alleged oral agreement under which decedent was to leave all of his property upon his death to plaintiff.

In a 4–3 decision, this Court held (quoting syllabus 9):

---

4 See currently GCR 1963, 302.4(2).—Reporter.

"There is no conflict of purpose between the so-called dead-man's statute barring testimony of an opposite party as to matters equally within the knowledge of a deceased person, and the court rules relative to discovery permitting depositions 'of any person' as both are intended to aid in arrival at truth and justice in litigation, hence, there is no unfairness in permitting defendants and their counsel to know what plaintiff's claims are and the foundation therefor and, at the same time, not waive their right to bar plaintiff's testimony at the trial on matters equally within knowledge of deceased as to alleged oral agreement to leave property to plaintiff (CL 1948, § 617.65 [Stat Ann § 27.914]; Court Rules No 35, § 6a, Nos 40, 41 [1945])."[5]

In *Schechet v. Kesten,* 372 Mich 346, we were confronted with the statute barring a physician from disclosing information he had obtained from a patient, and we held, in regard to discovery, interrogatories, and physician-patient privileges, as follows:

"Requirement of circuit judge of defendant physician that he answer interrogatories, put to him by plaintiff in action for libel and slander in report to credentials and executive committee of hospital in which defendant was chairman of department of surgery, which interrogatories required answers privileged from disclosure was reversibly erroneous, as the statutory privilege is an absolute bar even to the disclosure of the names of the patients not involved in the action (CL 1948, § 617.62 [Stat Ann § 27.911]; PA 1961, No 236, § 2157 [CLS 1961, § 600-.2157 (Stat Ann 1962 Rev § 27A.2157)])." (Syllabus 2.)

*Board of Education of Presque Isle Township School District No. 8 v. Presque Isle County Board of Education,* 364 Mich 605, presented the question

[5] See, currently, CLS 1961, § 600.2160 (Stat Ann 1962 Rev § 27A-.2160), GCR 1963, 302.1, 310, 311.—REPORTER.

of whether the school code had given to the county and State boards of education the power to attach or annex an inoperative school district to an operating district by direct order and subject only to winding up processes. In that case we held:

"A legislator's present recollection of what he understood as to the language enacted into law may not be used in interpreting the statute as enacted." (Syllabus 6.)

*Defendants' objection (5):* Intervening defendants state:

"Plaintiffs' assertion that due process requires 'a determination of disputed questions of fact on the basis of evidence' is only partially correct. The disputed questions must be *relevant* and the evidence must be *competent.* We have previously demonstrated at length, without necessity for present repetition, that the matters which plaintiffs would prove have no legal relevancy. The State and Federal standards sought to be shown simply do not exist and there certainly is no right to introduce proofs which, if true, would not establish a cause of action. Moreover, there is no right to introduce *incompetent* proofs on any issue.

"The ultimate issue in this case is whether the Austin-Kleiner plan complied with necessary constitutional requirements. This is a matter which can and must be determined from the plan alone, and/or available public records or matters susceptible of judicial notice, and not from the professed intentions or motivations of one or more commissioners."

Our comment on these five objections of defendants follow in the same sequence as listed above:

*Answer to objection (1):* We do not share the view of the defendants that gerrymandering was expected or condoned, or that the people through their dele-

gates created a plan that was an invitation to both
parties to select their four best gerrymanderers, who
would consider the welfare of the party above the
welfare of the voter or the State.

Article 4 of the Constitution shows that the dele-
gates selected a plan which, with its adherence to
county, city, and township lines, compactness, rec-
tangular or nearly uniform or square lines, *et cetera*,[6]
would make gerrymandering most difficult.

We believe that outstanding and dedicated Dele-
gate John Hannah (President of Michigan State Uni-
versity), when he recommended that the commission
consist of four Democrats and four Republicans,
being "persons with strong political feelings," did
so with the thought that each 4-member group would
be capable of preventing the other one from indulg-
ing in gerrymandering.

*Answer to objection (2):* Petitioners answer the
claim of defendants that if we would grant peti-
tioners' request we would be outrunning the United
States Supreme Court by calling attention to the fact
that until *Baker* v. *Carr* (1962), 369 US 186 (82
S Ct 671, 7 L ed 2d 629), claims regarding apportion-
ment of State legislatures were not justiciable at all;
that from a fair reading of recent cases[7] one can only
conclude that a plan which intentionally operates to
nullify the fair and effective representation of mem-
bers of one particular political party is as much a
denial of equal protection of the laws as districts of
grossly disparate population; that on March 15,
1965, the New York supreme court, New York county,
in *In re Orans' Petition*, 45 NY Misc 2d 616 (257
NYS2d 839), affirmed by 15 NY2d 339 (258 NYS2d

---

[6] Const 1963, art 4, § 2.—Reporter.

[7] *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L ed 2d
506); *Fortson* v. *Dorsey* (1965), 379 US 433 (85 S Ct 377, 13 L ed 2d
290); *Wright* v. *Rockefeller* (1964), 376 US 52 (84 S Ct 603, 11 L ed
2d 512).

825, 206 NE2d 854), held that gerrymandering constitutes a violation of the State's constitutional provisions, which were very similar to Michigan's; and that "The argument of defendant and intervening defendants that there is no law against gerrymandering suggests that although gerrymandering may be immoral, or unfair, or a sharp practice, nevertheless since there is no case law which says it is illegal, it should be condoned by this Court. The people of the State of Michigan are entitled to a higher standard of law."

It is not necessary for us to analyze or pass judgment on the presence or absence of Federal decisions *in re* gerrymandering. Suffice to say, there is no Federal decision that even intimates that this Court cannot or should not grant the petition if we deem it advisable.

*Answer to objection (3):* Petitioners' request is not a plea to be allowed to engage in a "fishing expedition" and is not limited by the three reasons set forth above by intervening defendants. This fact is established by petitioners' offer to prove the following:

"Austin and Kleiner and others who actually participated in the drawing of the Austin-Kleiner plan obtained and utilized extensive data and records of past voting results in each precinct, city, township, and county, specifically including the results of the 1962 State treasurer election, which data and records were compiled and tabulated by and with the support of the Democratic party and the International Union, UAW. The purpose of utilizing such data and records by Austin, Kleiner and their aides, was creation of an apportionment plan most favorable to the Democratic party and its candidates.

"Different variations of a plan with districts of equal population were drawn from time to time in the course of preparing the Austin-Kleiner plan, each of

which was tested by application of such data and past voting records, and such plan was successively revised and redrawn in attempts to maximize Democratic party voting strength, or to minimize Republican party voting strength.

"The draftsmen of the plan, after its adoption, openly boasted of their success in achieving their objectives and also stated openly that they intended the plan as 'a negotiating document' and had not expected to be able to get it adopted in its original form.

"The plan accomplishes such gerrymandering by apportioning the districts without any regard for political subdivision or natural or historical boundary lines, and by constructing unnaturally-shaped districts in order to join geographically separated concentrations of voters of one or the other party, or to split up certain of such concentrations.

"The intentional acts of malapportionment and gerrymandering for political advantage incorporated by the draftsmen of the plan include the following:

"(a)  By deliberately joining areas which the 1962 election results showed to have voted for a particular party's candidates, the draftsmen drew five house districts in Genesee county which canceled out Republican voting strength there altogether. Based on the 1962 results, all five districts would have gone to Democratic party candidates, although Republicans pulled approximately 45% of the overall vote. The actual results of the 1964 contests in these districts were that all five seats went to Democrats, although Republicans polled 39% of the vote.

"(b)  By contrast, the same technique of joining areas of known voting behavior was employed to maximize Democratic party voting strength in the five house districts in Kent county. There, the 1962 election results showed that two of the five seats would have gone to Democratic candidates while the Democratic party polled approximately 40% of

the overall vote. In 1964 the Democrats won their two seats handily.

"(c) Similarly, the 10 house districts encompassing Oakland county (plus three townships of Genesee county) were drawn in such a way that the Republicans could count on five 'safe' seats while polling, according to the 1962 election results, 60% of the vote. (The actual results of the 1964 contests in these districts were that the Republican candidates took four seats while polling 50% of the vote.) This was accomplished by dividing up cities so that areas of high Republican voting strength were impacted and extra Democratic pluralities could be added to areas of marginal Republican voting strength.

"(d) By crossing county lines to join together physically-separated cities which the 1962 election results showed to demonstrate Democratic party voting patterns, 'safe' Democratic senate seats were created in the senate districts 33 and 34. District 33 was formed by separating the city of Manistee, the county seat of Manistee county, from the rest of its county and joining it with a group of counties extending south to include the city of Muskegon, 75 miles away. Similarly, the cities of Saginaw and Bay City, respectively the county seats for their counties, were joined together into district 34, with a few intervening townships from both counties, while the rest of the surrounding townships from both counties, were formed into a horseshoe-shaped district 35. Based upon 1962 election results, districts 33 and 34 would be Democratic seats, while the adjoining districts 35 and 36 would be Republican districts, although any other configuration which did not involve the joining of the cities would not have resulted in a Democratic district in either area. These four seats came out exactly as predicted in 1964, two Republican and two Democratic.

"(e) In the case of senate district 17, the city of Pontiac, the county seat for Oakland county, together with seven townships in the northwestern

part of the county, was joined with all of Lapeer county in order to cancel out Republican voting strength in Lapeer county.

"(f) Other house districts were drawn in such a way as to split up parts of cities which were disclosed by the 1962 election results to be strong areas of Republican party voting, by dividing them into separate pieces and combining them with other cities for the purpose of diffusing and ultimately destroying the voting power of those concentrations, as in the case of house districts 31, 32, and 33, which cut into three parts the northwest quarter of the city of Dearborn, an area shown by the 1962 election results to have returned a high Republican vote.

"(g) In certain districts, such as house districts 43 and 51, townships where incumbent Republican legislators resided were unnaturally and unnecessarily detached from the rest of their counties and combined with territory containing another Republican incumbent in order thus to defeat one of them or force him to move away from his constituency."

*Answer to objection (4):* In 1931 this Court by Court Rule No 41[8] provided:

"Any party to an action or suit may cause to be taken by deposition   *   *   *   at any time after action commenced and before trial, the testimony of any other party, or any person who has verified a pleading of another party, which is material and necessary in the prosecution or defense of the action or suit."

Two years later this rule was construed twice by this Court. Justice WIEST, in *Nestle* v. *Fleming* (1933), 262 Mich 417, in construing this rule, stated (pp 418, 419):

"The party invoking the rule must definitely state the subject or subjects of intended inquiry and thus show the materiality and nature thereof, and may

---

[8] See, currently, GCR 1963, 302.1.—REPORTER.

not, at the examination, go beyond such specifications.

"Right to take the deposition can be tested by motion to vacate the notice. The issue then is whether the reasons for the notice and the information sought disclose a *bona fide* need in framing an issue or preparing for trial. The examination must not be for the purpose of enabling one party to merely pry into the case of the other to learn its strength or weakness, but only to seek information essential to the framing of appropriate issues and preparation for trial thereof.   *   *   *

"We must assume that the right accorded by the rule is invoked in good faith, and we cannot anticipate an abuse nor hold that possibility of abuse warrants inhibition of the right."

In *Vincent v. Van Blooys*, 263 Mich 312, this Court commented on the fact that, while (p 314),

"Court Rule No 41 was adopted from the New York practice,   *   *   *   the case concerns a rule of court, not a statute, and the rule is an experiment in this State, no discourtesy can be imputed to this Court for failing to find and follow a precedent from the New York conflict.

"Mr. Ragland [on discovery before trial] adduces evidence of the advisability of a liberal construction (page 130). This Court, speaking through Mr. Justice Wiest, has departed from the narrow New York construction, and has taken the broader trail. *Nestle v. Fleming*, 262 Mich 417.

"Aside from its advantage to a party in discovering the opponent's claim, the rule has a public purpose which should be served in its interpretation, arising from reducing the time of the trial by narrowing the issues, obtaining admissions of fact, fixing the claims of the parties when the incidents are fresh in their minds, and otherwise fostering accuracy and celerity of trial, and also from inducing settlements, which are made more easy

when the respective claims are known.  A rather liberal construction will obviate the necessity for taking the time of the court in haggling over the limitations of the examination.  Experience will disclose the evils which may develop and suggest the remedy."

In *Hallett v. Michigan Consolidated Gas Co.* (1941), 298 Mich 582, holding that rules relative to discovery should be liberally construed, we stated (p 592):

"Comparatively recent procedure for compelling discovery of the facts and circumstances of a controversy in advance of joining issue or in advance of trial is well established.  *  *  *  The recent trend and purpose of statutes and court rules is to provide accurate information in advance of trial as to the actual facts and circumstances of a controversy.  We have already said such rules must be liberally construed.  They should promote the discovery of the true facts and circumstances of a controversy, rather than aid in their concealment."

A majority of the present members of this Court during recent years have not only carried forward the liberal policy of the last 25 years but have extended it, earning for the State the reputation of being a leader among the States that advocate liberal use of discovery.[9]

The present request for discovery is vastly different from the discovery involved in the cases which defendants cite and to which we have referred above.  We are not now deciding whether a plaintiff should have help in discovery as he seeks money judgment, or a defendant receive help as he prepares his defense but, rather, whether petitioners (34 influential citizens living in various parts of this State) should be given the opportunity to present evidence

---

[9] See GCR 1963, 301 *et seq.*—REPORTER.

which they claim would prove that the plan this Court ordered adopted is not a plan of apportionment but rather a plan of malapportionment.

Previous decisions of this Court constitute no bar to petitioners' request if we deem it advisable.

*Answer to objection (5):* In reply to defendants' claim that "this is a matter which can and must be determined from the plan alone, and/or available public records or matters susceptible of judicial notice," petitioners answer:

"*Fortson* [*Fortson* v. *Dorsey*, 379 US 433 (85 S Ct 377, 13 L ed 2d 290)] states clearly that an apportionment scheme which does not disclose a mathematical disparity, nevertheless may be shown to 'designedly or otherwise * * * operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' Petitioners should be granted an opportunity to prove that the Austin-Kleiner Plan is such a scheme. The issue is primarily a factual one, yet this Court refused petitioners the right to present evidence and thereby place the facts before the Court. The proof required to establish such allegations must be substantial. *Honeywood* v. *Rockefeller* (ED NY 1963), 214 F Supp 897; *Wright* v. *Rockefeller* (1964), 376 US 52 (84 S Ct 603, 11 L ed 2d 512), affirming (SD NY 1962) 211 F Supp 460. As indicated by the *Honeywood Case, supra,* 'direct' evidence of the use of improper standards is the best evidence. To restrict petitioners to the official record of proceedings, as does this Court's order of February 5, 1965, prohibits obtaining such direct evidence, since the plan was not prepared in the councils of the commission."

When this Court on June 17, 1964, entered the order that voided this Court's adoption of the Hanna Plan under date of May 26, 1964, we directed the commission on legislative apportionment to "pro-

ceed to adopt a plan  *  *  *  in accordance with the constitutional requirements and guidelines provided by the United States Supreme Court in *Reynolds* v. *Sims,* 377 US 533 (84 S Ct 1362, 12 L ed 2d 506)  *  *  *  requiring that the districting and apportionment of both houses of State legislatures shall be as nearly as practicable on an equal population basis."[10]

That our words "as nearly as practicable" were strictly interpreted is shown by defendant Hare in his brief where he states:

"Defendant Hare agrees that as a practical matter 100% mathematical precision in the drawing of legislative districts cannot be achieved. However, this must be the target of those who would apportion, and any built-in devices such as the county-line requirement, which impede achievement of this aim, must fail. It cannot be denied that a mandatory and arbitrary requirement that county lines be observed in an apportionment scheme will result in some deviation from equality of population among the districts."

Intervening defendants interpreted our order to mean: *"Any* disparity which is unnecessary and avoidable is inexcusable."

Sustaining the Austin-Kleiner Plan, defendants repeatedly throughout their briefs call attention to how nearly equal in population each district is with the other, resulting in population from a high of 207,094 to a low of 205,067 in the senate districts.

Petitioners, contending that other standards, such as the adherence to county and other political subdivision boundary lines, *et cetera,* were disregarded, ask us to consider the following from *Reynolds* v.

---

[10] *In re Apportionment of State Legislature—1964,* 373 Mich 247, 248.—REPORTER.

*Sims,* 377 US 533, 577–579 (84 S Ct 1362, 12 L ed 2d 506):

"By holding that as a Federal constitutional requisite both houses of a State legislature must be apportioned on a population basis, we mean that the equal protection clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement. \* \* \*

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underline such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering."

It is not our intention in this opinion to pass judgment upon the dispute between petitioners and defendants as to standards. However, we do agree with petitioners' contention that the mere dividing of the State into districts of equal population does not and would not condone, justify, or excuse a method or system where, by the use of previous election results, districts can be formed giving one political party advantage over the other.

Petitioners commence their brief under the heading "statement of facts," as follows:

"By way of introduction to this statement of facts, the unique nature of this proceeding must be emphasized. Despite the fact that the proceedings raise disputed questions of fact, this Court has not allowed

the presentation of proofs offered by petitioners in support of their fact allegations. There is no record except the pleadings. Therefore, this proceeding resembles one in which a motion for summary judgment in favor of the defendants had been granted, and now the most favorable view must be taken of petitioners' allegations of fact and offer of proof. Thus, where relevant, those allegations of fact and the offer of proof in support thereof will, for purposes of this brief, be regarded as if actually proved."

In spite of petitioners' contentions, defendants have only presented this Court with a general denial. We have searched the brief of defendant and the briefs of intervening defendants in vain for any specific denial of petitioners' claim, such as the planners' use of voting results as they changed and re-changed the boundary lines of districts in their endeavor to create districts most favorable to the Democratic party and its candidates.

Petitioners in their reply brief commented upon defendants' seemingly avoidance, as follows:

"Petitioners have offered direct proof of the fact that Austin and Kleiner and their aides who drew the plan used past records of partisan election results, specifically the 1962 State treasurer's contest, to successively revise the districts to maximize Democratic party voting strength and to minimize Republican party voting strength. This offer of direct proof is noticeably missing from the categories of proofs which intervenors castigate as inadequate."

We are not impressed with defendants' claim that even conceding that petitioners could prove what they claim, such proof would not be relevant or competent. Conceding for the sake of argument that after considering said proof this Court would consider it irrelevant or incompetent, then certainly

this Court can reject it without the fear of improper influence that might result had it been submitted to a jury.

We agree with defendants that the ultimate issue in this case should not be determined from the "professed intentions or motivations of one or more commissioners." The test should not be what they intended to do, nor what they would have liked to have done, but, rather, what did they do.

## Conclusion

We are granting petitioners' request for the right to take proof and depositions because defendants have failed to present a convincing reason why petitioners' request should not be granted. In addition, we are conscious of the fact that the present apportionment plan never received a majority vote of approval of the commissioners, nor a unanimous vote of approval of this Court; that unusual, hasty, and brief consideration was given to the plan because of pending elections;[11] that we have always given lib-

[11] May 26, 1964: Majority vote of our Court disapproved the Austin-Kleiner Plan and approved the Hanna Plan;

June 11, 1964: Legislature by special enactment postponed primary election from August to September 1 (PA 1964, No 280 [CL 1948, § 200.51 *et seq.* (Stat Ann 1965 Cum Supp § 6.686[1] *et seq.*)]);

June 15, 1964: United States Supreme Court decision in *Reynolds* v. *Sims*, 377 US 533 (84 S Ct 1362, 12 L ed 2d 506);

June 17, 1964: This Court's order giving the commission until 5:00 p.m. on June 19, 1964, to adopt a plan meeting the requirements of *Reynolds* v. *Sims*, with the provision that if the commission should be unable to agree upon a plan within the time stated individual members of the commission would have until 12:00 noon the following day, June 20th, to submit individual plans to the Court, and a final provision that "further oral arguments or briefs will not be permitted by the Court";

June 19, 1964 (Friday): Commission met pursuant to Court order;

June 20, 1964 (Saturday): Commission not being able to agree by majority vote on any plan by Saturday noon, one plan by the Democratic members of the commission and several plans by the Republican members thereof filed;

June 22, 1964 (Monday): Our Court ordered the Austin-Kleiner Plan to be adopted. (See 373 Mich 247 and 373 Mich 250.)

eral construction to the rule of discovery and have
held, "We must assume that the right accorded by
the rule is invoked in good faith, and we cannot
anticipate an abuse nor hold that possibility of abuse
warrants inhibition of the right."[12]

An order will be issued providing that the deposi-
tions will be taken under the direction and super-
vision of the presiding circuit judge of the county
of Ingham; that said depositions will be taken as
soon as possible and continued on to completion
without delay; that 24 copies of the report of such
hearing on depositions will be filed with the clerk
of the Supreme Court and placed before the mem-
bers of this Court, so that this Court can reach
final determination in sufficient time to not unduly
impede the coming 1966 elections.

ADDENDUM, October 27, 1965.

I was assigned this case under our rotation assign-
ment system.   This addendum is being added be-
cause after originally writing under such assignment
opinions have been served challenging the propriety
and the right of this Court to grant discovery claim-
ing the question was moot because the majority of
this Court made known by the 1964 order that the
Austin-Kleiner Plan was confined to the 1964 election
and that said plan would be a nullity thereafter.

This present contention was not referred to in
my opinion nor in the pleadings, briefs, or argu-
ments of counsel for petitioners, defendant, or inter-
vening defendants.   I disagree that we have not the
right and duty to dispose of the discovery question
but after studying the opinions served and realizing
that of the five Justices, other than myself, who
have as of this date written opinions,[13] three have

---

[12] *Nestle* v. *Fleming, supra.*
[13] Justices BLACK, O'HARA, SOURIS, SMITH, and ADAMS,

expressed the thought that the commissioners should try anew to reapportion for the 1966 election, I have concluded to join with them with the understanding expressed that the commission shall immediately convene and shall conclude its work within 90 days and that we retain jurisdiction of all matters now before us, including the matter of discovery.

Dethmers, J., concurred with Kelly, J.

Black, J. (*for immediate mandate to commission*). By this paragraph 8 proceeding the Court's original jurisdiction has been duly invoked.[1] Our impending action or inaction is due to guide Michigan's governmental destiny; crucially at least for the coming second half of this decennium. And what we do *now* will determine largely whether the Court has served or failed to serve both of the Constitutions to which it is supremely and unitedly bound.

The mentioned proceeding was submitted to us May 11th last on thoroughgoing briefs and oral arguments. Though many less important matters have in the interim come to submission and decision, this one remains undetermined either as to procedure or substance. In the meantime the clock is ticking off that limited number of days and weeks left for *final* districting and apportionment of the legislature in time for the elections of 1966. We have failed so far to comply with the primary mandate of said paragraph 8; referring to our obligation to order the commission on legislative apportionment to perform its duty, that is, "proceed to district and apportion the senate and house of representatives according to the provisions of this

---

[1] All references in this opinion to paragraphs by number are to those which appear in section 6 of article 4 of the Constitution of 1963. Paragraph 8 is quoted *infra*.

Constitution."[2] That duty, when it is finally performed and upheld on "review" under paragraph 8, will effect the districting and apportionment of the legislature for the remainder of such decennium. It should be performed in pursuance of order to be entered here, and due time for such performance should be allowed. But time is fleeting; hence these purposeful presents.

Now then, the above considered: From and after our coming November session I mean to share no longer, with other members of the Court, the responsibility for further delay of orderly disposition of this gravely consequential proceeding. Censure and upshots ignored, the present motion for entry of an essential procedural order will be tendered to the clerk for filing at that time and copies will be sent to all involved counsel.

No one, bent other than on pretense, can deny the pressures and counter-pressures of politics to which this Court has been subjected since paragraph 7 and now paragraph 8 have required action of the Supreme Court of Michigan. Last year two members of the Court voted first (May 26, 1964; 372 Mich at 480–482) to effectuate under paragraph 7 the so-called Hanna plan. Then (June 22, 1964; 373 Mich 250–255) the two voted to effectuate under paragraph 7 the so-called Austin-Kleiner plan; which last plan was the one which the Court ordered into effect for the 1964 legislative elections (see 372 Mich at 480–482; 373 Mich at 248–255). Even the baited subject of *amount of salary, to be paid in the future to Supreme Court Justices,* appeared in a

---

[2] For my view of what was intended by the phrase, "according to the provisions of this Constitution," see 372 Mich 448–456. By force of the National supremacy clause "this Constitution" includes the equality clause of the Fourteenth Amendment as well as our own equality clause. The latter appears in article 1, § 1 of the Constitution of 1963.

measure[3] which was proposed in and passed by the
senate during the current legislative session, and
then was held up by the house. And this is to say
nothing of what is rancorously implicit as well as
explicit in the previous deadlocks of the half Repub-
lican and half Democratic commission on legislative
apportionment. With respect to those deadlocks
we were called upon to act, and did act provisionally
(see *In re Apportionment of Legislature—1964*, 372
Mich 418, 461; 373 Mich 247), under paragraph 7
of said section 6.

The circumstances now are progressively emer-
gent. The question of need under the Constitution
for timely judicial action is foremost. The next
is that the Court should dispel promptly any notion
that its members are shrinking from procedural
and substantial decisions on account of fear of per-
sonal or political consequences.

Pursuant to the procedure set forth in said para-
graph 8, I stand for entry of an order directing
the commission to do what is required of it and
what it has not yet done, that is, "district and appor-
tion the senate and house of representatives ac-
cording to the provisions of this Constitution." That
task is assigned to the commission by the Constitu-
tion; whereas our task under said section 6 is lim-
ited to supervision and seeing firmly to it that the
commission proceeds to conclusion of its due duties
in accordance with constitutional requirements.

Bear in constant mind that the present invocation
of original jurisdiction is before us under paragraph
*8* of said section 6; whereas last year's proceeding
arrived under and was determined pursuant to pro-
visional paragraph *7* of said section 6 (see *In re
Apportionment of Legislature—1964,* all opinions

---

3 See SB 364, 1965.—Reporter.

and orders cited *supra*).[4]   Now we have before us an out-and-out judicial proceeding; a proceeding which is attended automatically by those broad equitable powers which, since the handing down of *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663), the courts have utilized and are now utilizing as they go about this business of supervising, with applicable constitutional limitations in mind, the assigned duties of those who must district and apportion legislative assemblies.

Refer now to the Court's orders of June 17 and 22, 1964 (373 Mich 247, 248, 249, 254, 255).   Then the time limit was critical.   The commission was directed to adopt the Austin-Kleiner plan for the imminent 1964 elections,[5] subject expressly to any paragraph 8 proceeding such as is before the Court instantly.   The concluding paragraph of the June 17th order, along with the final two paragraphs of the supplementing order of June 22d, stress the temporally ordered character of the Austin-Kleiner plan.   And quoted paragraphs 7 and 8 of said section 6 made it so in any event.   To quote

---

[4] Paragraphs 7 and 8 (Const 1963, art 4, § 6) read as follows:

"If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the Supreme Court.   The Supreme Court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section."

"Upon the application of any elector filed not later than 60 days after final publication of the plan, the Supreme Court, in the exercise of original jurisdiction, *shall* direct the secretary of State or the commission to perform their duties, *may* review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this Constitution."

[5] The so-called apportionment decisions, on which the Court had been waiting since March 5, 1964 (372 Mich 418), were not handed down until June 15, 1964 (*Reynolds* v. *Sims* through *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 US 533–765 [84 S Ct 1362–1489, 12 L ed 2d 506–652]) and the deadline date given us by the secretary of State (373 Mich 250, 251, 253) was due to arrive in three days.

the aforesaid paragraph of the June 17th order (373 Mich 248, 249):

"Any plan adopted by the commission on legislative apportionment or, in the event said commission is unable to agree upon a plan, any plan thereafter directed to be adopted by this Court shall be subject to the provisions of paragraphs 6 and 8 of said section and article: Provided, however, That because of the necessity of insuring orderly election procedures for the year 1964, in no event will the litigation permitted under paragraph 8 of said section 6 affect, alter, change, or amend the plan adopted by the commission under either paragraph 5 or paragraph 7 of said section 6, insofar as 1964 legislative elections are concerned."

I hold (a) that it is the constitutionally *exclusive* duty of the commission on legislative apportionment to district and apportion the senate and house of representatives; (b) that that duty cannot, under said paragraph 8 or otherwise, be taken over by this Court without violating the plain directions which appear in said section 6 of article 4; (c) that the commission on legislative apportionment has not as yet performed its duty for the entire remainder of the present decennial period, and (d) that it is our peremptory responsibility under said paragraph 8 to instruct the commission as follows:

1. To proceed anew with such work and deliberations as will enable the commission to district and apportion the senate and house of representatives according to now ascertainable as well as applicable constitutional requirements, and to do so pursuant to the procedures that are exacted by said section 6;

2. To complete the work thus required of the commission within 60 days from and after the date of entry of such order.

Our order should additionally provide:

3. In event of another deadlock of the commission, continuing through expiration of such 60-day period, that the secretary of the commission should report such fact promptly to this Court with accompanying petition for instructions whereby that deadlock may be broken by such mandatory order as the Court may enter pursuant to its broad powers as on mandamus to a State officer, and

4. For specific retention of jurisdiction over the present proceeding until some "final plan" is reviewed here and found consonant with constitutional requirements.

## SUMMARY.

*First:* There remains time for contemplative work and deliberately effective action by the commission, provided we direct the commission — now — to proceed. Since the commission arrived at its time-pressured stalemate last year, a selective if constitutionally circumscribed discretion has been confided, to the districting and apportioning authorities of the respective States, by the mentioned apportionment decisions of the Federal Supreme Court. This should render the commission's task much less difficult.

*Second:* We should not presume that the commission will not — given time as above — agree upon and adopt a plan according to its prescribed duty. This is especially so now that controlling guidelines, formerly in bitterly contested legal doubt, have become an understood part of our Constitution by the immediate force of section 1 of the first article thereof and the final force of article 6 of the National Constitution. Nevertheless, if it should turn out that a majority of the commission, aided thus by time and supreme authority, again cannot agree,

this Court can and should break the deadlock by peremptory order framed generally to the procedure which is set forth in our general election law[6] when two or more persons, being candidates for the same constitutional office, have received an equal number of votes. A public drawing of lots, to determine what 7 members of the commission are to vote upon that necessary "final plan," will take care of any such possible repetition of disagreement.

*Third:* It is said that the Court should proceed now to "review," principally upon depositions to be taken, the provisionally effected Austin-Kleiner plan. I respectfully suggest that we cannot do so. The Austin-Kleiner plan is not a "final" one we may review under said paragraph 8. No "final plan" has as yet been adopted for want of a "concurrence of a majority of the members of the commission." See paragraphs 5, 6, and 8 of said section 6, and the absence of the word "final" from paragraph 7. Thus, by operation of paragraph 8 and the timely institution of this original proceeding, the question of the constitutionality of the Austin-Kleiner plan has become moot. What this Court needs, prior to "review" under paragraph 8, is that which has not as yet come into being, a "final plan."

Now if the Court should attempt "review" of the provisionally adopted and nonfinal Austin-Kleiner plan, and for such purpose should authorize the taking of what bids fair to become a politically contentious and trenchantly sensational series of discovery depositions, any such movement sidewise would require constant supervision of such depositional taking on expectably regular motions and orders. Worse, it would consume more and more nonexpendable weeks and months of time between

6 See CLS 1961, § 168.551 (Stat Ann 1956 Rev § 6.1851).—Reporter.

this date and the deadline of next June. It would —
Michigan politics considered — foreclose all chances
of *final* "review" under paragraph 8 and *final* effect
of any *final* plan prior to such deadline. And it
would disgust the people of Michigan the more with
their Supreme Court.

I vote for prompt entry of an order as outlined
above.

Since the foregoing declaration of intention to file
and serve was communicated to other members of
the Court, Justice SOURIS has written again that
section 6 of said article 4, along with just about
all of the critical rest of said article 4, is unconstitu-
tional. See Justice SOURIS' opinions of last year,
372 Mich 418, 461–469, and 373 Mich 247, 257–262.
At that time comment was unnecessary. Now it is
imperative lest a gymnastically swinging majority
of this Court is induced to take over the cliff, into
the abyss of one-party partisanship, that which the
Constitution refers to as the "legislative power of
the State of Michigan."

Now I think all reasonable viewers of the Con-
stitution of 1963 (distinguishing them purposely
from those feverishly intense liberals who look ex-
clusively to Washington, or in lieu thereof to their
own manufactured dixits, for "the rule of law") will
agree that the people of a State, choosing so to do,
may validly provide by their Constitution that an
appointed commission, rather than the legislature,
shall regularly district and apportion the legislature
of that State. The people of Michigan have done
so, by said section 6, and no specific clause or word
of that section is pointed out as being offensive
to any other constitutional provision. It is simply
said that section 6, *procedural* entirely in its nature,
is so intertwined with earlier sections of *substance*

(said to be wholly invalid) that all are inseparable "and that the constitutional invalidity of 1 or more of said sections invalidates the remainder." (Quotation from Justice Souris' former opinion, 373 Mich at 259.)

Let us examine this argument; an argument which, to the time of 1964 writing, was pressed upon the Court by no one excepting Justice Souris. In a preliminary way, I must observe that it really is just a matter of accidental coincidence that this motion to butcher-cleave section 6 from our Constitution would, if granted, leave a grateful as well as gleeful Democratic legislature pretty much free to district and apportion itself at leisurely will, just as was so disgracefully known over the years when a Republican legislature was continuously charged and continuously failed with that duty. Sirrah, it must be said again that the Supreme Court of Michigan is loftily separated from partisan politics.

The question of severability depends in the last analysis upon the will of the people themselves[7]; not upon the fragmented and abstruse utterances of convention delegates who, even as selectively and restrictively quoted by Justice Souris, touched neither directly nor indirectly upon that precise question (see *Bacon* v. *Kent-Ottawa Authority,* 354 Mich 159, and citations therein contained)[8]. To test the question of severance of section 6 one need but point out that the section pertains exclusively to constitutional *procedure* and not to constitutional *substance.* It is fully operative with or without any preceding article 4 section of substance provided the following

---

[7] "The question in interpreting a constitution is not so much how it was understood by its framers as how it was understood by the people adopting it." 11 Am Jur, Constitutional Law, § 84 page 707. For the new text, see 16 Am Jur 2d, Constitutional Law, § 88, p 274.

[8] See, also, the copious citations appearing in *Lockwood* v. *Commissioner of Revenue,* 357 Mich 517, commencing at 567.

portion of sections 1, 2 and 3 of said article 4 (with which no Justice dare quarrel) is regarded as constitutionally intact.   Such portion reads:

"Sec. 1. The legislative power of the State of Michigan is vested in a senate and a house of representatives.   .

"Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor.

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population as provided in this article.   The districts shall consist of compact and convenient territory contiguous by land."

Now I am unable to find anything in section 6 which prevents due application thereof to *any* plan of districting and apportionment of the Michigan legislature which the commission, going on with its work under current guidelines, may decide to adopt and place in effect, subject of course to review, for constitutional test, under paragraph 8 of the section.   So there is nothing difficult about the point raised by my Brother SOURIS.   All we need do is weigh his conclusion that section 6 is inseparable from that which immediately precedes it and, therefore, that section 6 cannot be made operative and sufficient to accomplish its procedural purpose.   If he is right, and I suggest he is not, then this Court has been fooling around with unconstitutional procedure, under said paragraphs 7 and 8, ever since February 4, 1964, that being the date of filing here of the first of the paragraph 7 plans.   See details, 372 Mich at 419.

So far as concerns my Brother's allegation, which I now reduce in paraphrase to save a wearisome number of words, that one voting for the instru-

ment in 1963 would have voted the other way had he believed the so-called 80–20 formula would be held subordinate to the equality clause of the first article thereof, it is sufficient to say that that kind of reasoning, if majority-accepted, would require that the Court annihilate either the *whole* of the Constitution of 1963, or at very least *all* of article 4 thereof. The latter course would mean government without a legislature with the Supreme Court really supreme. I shrink from such heady stuff.

Further, when Justice Souris says:

"In short I do not believe the people of this State would have delegated the apportionment of legislative power to commissioners, neither elected by the people nor selected by any of the people's elected representatives, but, instead selected by the State organizations of the major political parties, except for the fact that the proposed constitution permitted those commissioners to function only within rigid limitations imposed by constitutionally stated mathematical formulae."; ·

I feel obliged to rejoin that I in turn "do not believe" the people ever would have delegated the apportionment of legislative power to the legislature, again that is. (See article 5, § 4, Const 1908, and the amendment thereof which was ratified at the general election of November 4, 1952.) Assuming that each of us now may state his beliefs and disbeliefs as testimony to the way a majority of those voting viewed the new instrument in April of 1963, I do not believe that a voting majority of the electors would have voted for the proposed constitution *had it not included section 6 or some separate-from-the-legislature counterpart thereof.* Surely my Brother forgets that the people of Michigan learned, over a long period of years, one thing the hard way, that is, they could not trust any legislature to district and apportion itself according to any validly im-

posed constitutional principle or plan which might collide with self-perpetuation in office.

This question of severability is no point of constitutional interpretation at all. It is simply a political question; whether a majority seated here wants the constitutionally appointed commission to district and apportion the legislature hereafter, or whether it wants the legislature restored to that body's former position of substantial control over its own political destiny. Which is to say in short shrift that I view with disfavor any and all attempts to strike down, for no reason of *prima facie* legal value, any part of any Constitution.

I stand as before for entry of an order as outlined above.

O'HARA, J. (*for remand to commission*). I regret that I am unable to agree with Mr. Justice KELLY's conclusion. I accept his statement of the nature of the pending proceeding. However, I believe the function of the Supreme Court under paragraph 8, § 6, article 4, of the Constitution of 1963, is unique in our jurisprudence. It follows therefore that unique procedure to effect its terms may well result.

I think it impractical to attempt to dispose of the petition before us within the limitations of existing judicial precedent. Indeed, I must record that I believe there may exist a serious conflict between the limitation in section 2 of article 3, restricting the judicial branch to the exercise of judicial power and the duties cast upon this Court by article 4. Only the language of extension in article 3 "except as expressly provided in this Constitution," saves an irreconcilable conflict.

I hold our order of June 17, 1964, and its supplement of June 22, 1964, were conditional as clearly

as they could be made conditional by express language.[1]  The language was not included idly.

[1] *June 17, 1964:* "The Court's orders of February 6, 1964 and of May 26, 1964, authorizing and directing procedures to be followed under the 7th paragraph of section 6 of article 4 of the Constitution of 1963, are modified to the following extent:

"The commission on legislative apportionment is directed to proceed to adopt a plan for districting and apportioning the senate and house of representatives in accordance with the constitutional requirements and guidelines provided by the United States Supreme Court in *Reynolds* v. *Sims*, 377 US 533 (84 S Ct 1362, 12 L ed 2d 506); *WMCA, Inc.,* v. *Lomenzo, Secretary of State*, 377 US 633 (84 S Ct 1418, 12 L ed 2d 568); *Maryland Committee for Fair Representation* v. *Tawes, Governor*, 377 US 656 (84 S Ct 1429, 12 L ed 2d 595); *Davis* v. *Mann*, 377 US 678 (84 S Ct 1441, 12 L ed 2d 609); *Roman* v. *Sincock*, 377 US 695 (84 S Ct 1449, 12 L ed 2d 620); and *Lucas* v. *Forty-Fourth General Assembly of the State of Colorado*, 377 US 713 (84 S Ct 1459, 12 L ed 2d 632), decided June 15, 1964, requiring that the districting and apportionment of both houses of State legislatures shall be as nearly as practicable on an equal population basis.  The commission is allowed until 5 p.m., Friday, June 19, 1964, to adopt a plan in accordance with said constitutional requirements.  In the event the commission is unable to agree upon a plan, each member of the commission, individually or jointly with other members, may submit additional proposed plans to this Court within the time limit of 12 noon, Saturday, June 20, 1964.  Further oral arguments or briefs will not be permitted by the Court.

"Any plan adopted by the commission on legislative apportionment, or, in the event said commission is unable to agree upon a plan, any plan thereafter directed to be adopted by this Court shall be subject to the provisions of paragraphs 6 and 8 of said section and article: *Provided, however,* That because of the necessity of insuring orderly election procedures for the year 1964, in no event will the litigation permitted under paragraph 8 of said section 6 affect, alter, change, or amend the plan adopted by the commission under either paragraph 5 or paragraph 7 of said section 6, insofar as 1964 legislative elections are concerned."

· *June 22, 1964:* "This matter having been brought to this Court under the provisions of article 4, section 6 of the Constitution of the State of Michigan, and various plans having been heretofore submitted under said article and section by the members of the commission on legislative apportionment, and the Court having given due consideration to the matters so brought before it, THEREFORE, IT IS ORDERED that the commission on legislative apportionment be, and it hereby is, directed to adopt and publish forthwith, as provided in section 6 of article 4 of the Constitution of the State of Michigan of 1963, the Austin-Kleiner plan filed May 11, 1964 which plan shall be placed into effect for the primary and general elections of 1964 irrespective of whether or not said plan shall be challenged upon the application of an elector pursuant to the final paragraph of said section 6 of article 4.

"Considering the limited time which remains for the giving of notices of 1964 legislative elections, no motion or applicaton for a stay of this order will be entertained by this Court.  Any person deeming himself aggrieved by this order may, for the purposes and requi-

The primary responsibility of the districting and apportionment of this State was constitutionally imposed upon the commission on legislative apportionment. It should discharge its duty.

I voted to direct the commission to adopt the alternate Austin-Kleiner plan because it then most closely complied with the basic Federal mandate to apportion both houses of the State legislature as nearly as possible on a "one-man—one-vote" basis. This was the *sine qua non* of Federal constitutionality.

The State constitutional requirements[2] that the geographic integrity of senatorial districts existing at the time of reapportionment remain unaltered; that the single member representative districts be compact, contiguous, and as nearly square in shape as possible; that representative areas consisting of more than one county, entitled to more than one representative, be divided into single member districts as equal as possible in population but adhering to county lines, I do not believe have yet been considered by the commission. These guidelines, while they cannot supersede the basic equality of population factor, may be considered. Whether these State constitutional requirements are infirm by reason of their unseverability from the now known federally unconstitutional 80-20 formula, I do not pass upon. Nor need this issue be passed upon here. Federally constitutional or not, they are still sensible, voter-expressed guidelines for legislative districting and apportionment. If they are respected, and if determined effort is made to effect them, then much of the alleged partisan political districting in the conditionally approved plan could be eliminated.

sites of USSC Rules 18, 50, and 51, proceed to move or apply forthwith for a stay pursuant to said rules, in the same manner as if he had previously and vainly moved or applied to this Court for such stay."

2 Const 1963, art 4, §§ 2, 3.—REPORTER.

I would remand the conditionally approved alternate Austin-Kleiner plan to the commission for further consideration in light of the additional guidelines set forth herein. I would retain jurisdiction of the pending cause. If within 60 days of our order of remand, the commission has not agreed on a plan, I would direct that all plans be resubmitted to this Court for our further action in relation thereto. All without prejudice to our ultimate disposition of the pending "petition for review." No costs.

ADAMS, J. *(for remand to commission).* I agree that this matter should be remanded to the commission on legislative apportionment. Not until June 15, 1964, with its decision in *Reynolds* v. *Sims,* 377 US 533 (84 S Ct 1362, 12 L ed 2d 506), did the United States Supreme Court state even the basic standards to be followed in apportionment of State legislatures. Chief Justice Warren recognized this fact, saying (p 559):

"Of course, in these cases *we are faced with the problem* not presented in *Gray*[1]—that *of determining the basic standards and stating the applicable guidelines* for implementing our decision in *Baker* v. *Carr.*"[2] (Emphasis suplied.)

On June 17, 1964, we instructed the commission on legislative apportionment to devise a plan in accordance with the standards and guidelines furnished by the United States Supreme Court. The commission was allowed until 5 p.m., Friday, June 19th, to adopt such a plan. In the event the commission failed to reach agreement within that time, the individual members were allowed to submit plans by 12 noon of the next day. This brief period was dictated by the impending 1964 elections. The secre-

[1] *Gray* v. *Sanders,* 372 US 368 (83 S Ct 801, 9 L ed 2d 821).— REPORTER.
[2] 369 US 186 (82 S Ct 671, 7 L ed 2d 629).—REPORTER.

tary of State had informed this Court that orderly elections would be impossible unless a plan was ordered and placed in effect by Thursday, June 25, 1964.  See *In re Apportionment of Legislature— 1964,* 373 Mich 250, 253.

The four Democratic members of the commission had foreseen the overriding guideline in *Reynolds* v. *Sims* and had, on May 11, 1964, submitted to this Court the alternate Austin-Kleiner plan based upon the formula of one man-one vote.  The four Republican members of the commission apparently had not foreseen this development.  At any rate, they did not submit a plan in accordance with that formula.  During the brief time allowed the commission to attempt to devise a plan in accordance with *Reynolds* v. *Sims,* the Democratic members made no revisions or changes in the alternate Austin-Kleiner plan they had submitted May 11, 1964.  The Republican members were unable to devise a plan that met the Federal standard.

It may be proved that the alternate Austin-Kleiner plan is the only feasible one for districting the State legislature in accordance with Federal standards. However, I believe the entire commission should be afforded an opportunity to consider 'the standards and guidelines furnished by the United States Supreme Court and to devise the best plan it can.  It did not have that opportunity in the brief time given it in June of 1964.

While the United States Supreme Court iterates and reiterates that "population is  *  *  *  the controlling consideration in the apportionment of seats in the particular legislative body" (*Reynolds* v. *Sims, supra,* 581), the Court does recognize other standards and guidelines which either are to be or may be applied.  Those standards and guidelines can best be determined from a thorough reading and rereading of *Reynolds* v. *Sims.*  It may be help-

ful, however, to point out that the Court does not approve gerrymandering. These quotations from the majority opinion in *Reynolds* v. *Sims* should suffice:

"The existing apportionment, and also to a lesser extent the apportionment under the Crawford-Webb act, presented little more than *crazy quilts*, completely lacking in rationality, and could be found invalid on that basis alone." *Ibid*, 568. (Emphasis supplied.)

"Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Ibid*, 578, 579.

"And *a State may legitimately* desire to *construct districts* along political subdivision lines *to deter the possibilities of gerrymandering.*" *Ibid*, 581. (Emphasis supplied.)

Going to the question of permissible State standards, it is to be noted that the Court said:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." *Ibid*, 578.

Recently, in *WMCA, Inc.*, v. *Lomenzo*, 382 US 4 (86 S Ct 24, 15 L ed 2d 2), the United States Supreme Court affirmed the judgment in *WMCA, Inc.*, v. *Lomenzo* (DC SD NY), 238 F Supp 916. Of this action, Mr. Justice Harlan stated:

"The three-judge court * * * rejected contentions that apportioning on a basis of citizen population violates the Federal Constitution, and that partisan 'gerrymandering' may be subject to Federal constitutional attack under the Fourteenth Amendment. In affirming this decision, this Court

necessarily affirms these two eminently correct principles."

I do not regard the affirmance in *Lomenzo* as a definitive statement of the position of the United States Supreme Court on gerrymandering, especially in view of *Reynolds* v. *Sims, supra,* and *Fortson* v. *Dorsey,* 379 US 433, 439 (85 S Ct 498, 13 L ed 2d 401). In this latter case, the Court stated:

"It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster. This question, however, is not presented by the record before us."

At any rate, it seems clear that a State may forbid political gerrymandering, and I interpret the provisions of the Michigan Constitution with regard to compactness, shape, et cetera, as being precisely for that purpose. Though the Federal standards are overriding and must be followed, I see no reason why the standards and provisions in our own State Constitution should not also be applied if it is possible to do so. I do not regard the failure of the 80–20 formula as having destroyed these standards. The commission should apply them, if at all possible, always remembering that the United States Supreme Court said:

"We hold that, as a basic constitutional standard, the equal protection clause requires that the seats in both houses of a bicameral State legislature must be apportioned on a population basis." *Reynolds* v. *Sims, supra,* 568.

I will vote in favor of a suitable order to remand to the commission on apportionment.

SOURIS, J. *(for adjournment of proceedings).* Consistent with the judgments I announced on April 10, 1964, in *In re Apportionment of State Legislature —1964,* 372 Mich 418, 461–469, and again on June 24, 1964, in *In re Apportionment of State Legislature— 1964,* 373 Mich 247, 257–262, I would deny relief requested in the petition now before this Court purportedly pursuant to authority found in the eighth paragraph of section 6, article 4, Constitution of 1963. It was my judgment in 1964, as it is now, that, except as set forth in the margin,[1] none of the first six sections of article 4 legally survived our finding that the 80–20 formula for apportioning the senate and the .7% formula for apportioning the house violated the equality clause of the Fourteenth Amendment of the United States Constitution. My reasoning can be found in my separate opinion of June 24, 1964 in *In re Apportionment of State Legislature—1964,* 373 Mich 247, 257–262.

While this Court's majority (the Chief Justice and Justices BLACK, SMITH, O'HARA and ADAMS) did not discuss the issue of severability in the June, 1964, opinions reflecting its decision (see the Chief Justice's opinion at 373 Mich 250, 251 and Justice O'HARA's concurring opinion at 373 Mich 250, 255), by that decision the majority rejected, *sub silentio,* the contention I made first in my opinion of April 10, 1964, 372 Mich 418, 461–469, and which I repeated in my opinion of June 24, 1964, 373 Mich

---

[1] "Sec. 1. The legislative power of the State of Michigan is vested in a senate and a house of representatives.

"Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor. * * *

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population."

250, 257–262, that most of the first six sections of article 4 of the Constitution of 1963, including all of section 6 which purported to authorize creation of the legislative apportionment commission and the procedures for Supreme Court review of its work, were invalid because legally inseparable from the constitutionally invalid apportionment formulae of article 4. With due respect for my colleagues' judgment, I cannot join now, as I could not in June of 1964, in any decision of this Court which in my judgment erroneously perpetuates the legislative apportionment commission notwithstanding the constitutional invalidity of its creation.

I cannot accept the suggestion, implicit in the Court's 1964 decision and in its current decision, that the people of this State intended the legislative apportionment commission, the members of which are selected by the two or three major political parties of the State, to wield such extraordinary powers of government without the precise limitations the people attempted invalidly to impose upon the commission in the form of the 80–20 and the .7% formulae, limitations which the constitutional convention debates demonstrate were crucial to the delegate majority's willingness to repose the decennial task of reapportionment in the commission.

Delegate Yeager, a member of the convention's legislative organization committee,[2] expressing his opposition to a proposal to permit the house of representatives to be apportioned upon a population basis with no greater population variance between districts than 15%, said the following:

"The reason I could not support this amendment is because in establishing the apportionment commission before our committee to take care of the periodic reapportioning on the basis of the census,

2 1 Constitutional Convention Record, p 99.—REPORTER.

we made the commitment and came up with the proposition that we would allow no discretion or very little discretion to such an apportioning body, and it would simply be a physical act of following a specific, well defined formula within the constitution. And this was the basis and the theory upon which the apportioning commission was established. This does not take away that discretion. As a matter of fact, it allows a great deal of discretion, and for these reasons I could not support this proposition relating to a population basis in the house." 2 Constitutional Convention Record, p 2140.

Shortly thereafter, in support of his own proposal to increase the house formula from .7% to .75%, a proposal which did not pass, Delegate Yeager said:

"As I stated earlier, when the Cushman-Hodges amendment was up, one of the stipulations the committee went into quite thoroughly was in having an apportionment commission that was going to be working within the Constitution with defined formulas which would allow as little discretion to such a commission as possible. This was done frankly to eliminate political trading as much as possible within this commission. We feel that this formula of allotting the first seat based on the .75% and distributing the balance of the seats on equal proportions is a definable formula, and leaves very little discretion with that body. The minority report, on the other hand, would have left a great deal of discretion with that body, and if you drew the lines one way you got an entirely different deviation from the other." 2 Constitutional Convention Record, p 2142.

The report of the legislative organization committee to the convention, which accompanied the committee's proposal of the subsequently adopted apportionment formulae, described the committee's objectives in these terms:

"The majority of the committee feels this plan offers many advantages.  It is responsive to population shifts so that the precise balance of population and area can be maintained.  It limits considerably the discretion of the apportioning commission because it is based on a clearly stated formula rather than vague guides.  Most important, the plan achieves precisely what it is designed to accomplish, a blend of population and area factors in a logical and effective way."  2 Constitutional Convention Record, p 2036.

Delegate G. E. Brown emphasized the importance of limiting the proposed legislative apportionment commission's discretion in comparing a committee's proposal that the method of equal proportions be used in apportioning the house with a counter proposal made by that committee's minority members:

"Now, in the discussion of the committee in arriving at a decision to use the method of equal proportions after setting up the legislative areas at 7/10 of 1 per cent, the committee was concerned with minimizing the discretion which an apportioning body or commission might exercise with respect to the assignment of seats after the first initially given, not only for this decennial census, but for every decennial census.  It was felt that a formula that will eliminate, to the extent possible, discretion in the apportioning body will prove to be a fairer and more equitable way of distributing house seats, not permitting the gerrymandering and the malapportionment that can exist when a great deal of discretion is left to the apportioning body, which up until the time we adopted Committee Proposal 79, of course, was the legislature.  *  *  *

"The second point is that there is a discretionary assignment of the additional seats under the minority proposal.  In each case it leaves almost complete discretion to the apportioning body insofar as the adjustment of initially setting up the districts, and

then secondly, assigning the additional seats. Too, by using the method they use, the deviation should be limited on an absolute basis; but in our case the legislative areas are set up by a certain formula, the additional seats are assigned by a priority list." 2 Constitutional Convention Record, pp 2132, 2133.

Judge Dehnke, another delegate, described the role of the proposed legislative apportionment commission in these terms:

"If the proposal for the apportionment commission is adopted, the Constitution itself will set up pretty strict rules to govern the determination of this commission. The commissioners will not be left free to ramble at will. And it's a matter of the decision by each member within those prescribed limits that is important, and we won't be involved in calling in any adding machine to make the computation." 2 Constitutional Convention Record, p 2021.

Finally, Delegate Plank described the proposed commission's role accurately, as well as trenchantly, in the following colloquy with Delegate Danhof:

"*Mr. Danhof:* Now, I further take it from the makeup of this particular commission, being 4 members from each of the political parties—and we will stick with 2, since we don't have a third one getting close to 25 per cent of the vote—that as a very practical matter, if we put 4 Republicans and 4 Democrats together in a room and tell them to come up with a plan, there's going to be a little horse-trading going on in order to come up with a plan. I mean, was this some of the philosophy that was behind the committee's thinking?

"*Mr. Plank:* Well, we had both groups in our committee, and it's pretty difficult to come up with much horsetrading with the formulas we have so designed." 2 Constitutional Convention Record, p 2024.

Upon completion of its work, the convention adopted an Address to the People for distribution before the election on the question of adoption of the proposed constitution.   In the preface thereto, the legislative apportionment commission's process of apportionment was characterized "as mathematically exact a system as possible for assigning a prescribed number of seats in each chamber".   2 Constitutional Convention Record, p 3359.   The address speaks in terms of "providing the formula for the apportionment of senate seats" and "the application of a mathematical formula to the population of each of the previously established representative areas".   2 Constitutional Convention Record, pp 3369, 3370.

But even without the benefit of these forthright descriptions, from the convention debates and the Address to the People, of what was done to make certain the legislative apportionment commission's powers would be rigidly proscribed by the formulae we have determined to be constitutionally invalid, the document itself dispels any notions to the contrary.   See sections 2 and 3 of article 4 set forth in the margin.[3]   The simple truth is this:  If anyone

---

[3] "Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor.

"In districting the State for the purpose of electing senators after the official publication of the total population count of each Federal decennial census, each county shall be assigned apportionment factors equal to the sum of its percentage of the State's population as shown by the last regular Federal decennial census computed to the nearest one-one hundredth of one percent multiplied by four and its percentage of the State's land area computed to the nearest one-one hundredth of one percent.

"In arranging the State into senatorial districts, the apportionment commission shall be governed by the following rules:

"(1) Counties with 13 or more apportionment factors shall be entitled as a class to senators in the proportion that the total apportionment factors of such counties bear to the total apportionment factors of the State computed to the nearest whole number.   After each such county has been allocated one senator, the remaining senators to which this class of counties is entitled shall be distributed among

in this State voted for or against the proposed constitution because he believed the legislative appor-

such counties by the method of equal proportions applied to the apportionment factors.

"(2) Counties having less than 13 apportionment factors shall be entitled as a class to senators in the proportion that the total apportionment factors of such counties bear to the total apportionment factors of the State computed to the nearest whole number. Such counties shall thereafter be arranged into senatorial districts that are compact, convenient, and contiguous by land, as rectangular in shape as possible, and having as nearly as possible 13 apportionment factors, but in no event less than 10 or more than 16. Insofar as possible, existing senatorial districts at the time of reapportionment shall not be altered unless there is a failure to comply with the above standards.

"(3) Counties entitled to two or more senators shall be divided into single member districts. The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the county by the number of senators to which it is entitled. Each such district shall follow incorporated city or township boundary lines to the extent possible and shall be compact, contiguous, and as nearly uniform in shape as possible.

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population as provided in this article. The districts shall consist of compact and convenient territory contiguous by land.

"Each county which has a population of not less than seven-tenths of one percent of the population of the State shall constitute a separate representative area. Each county having less than seven-tenths of one percent of the population of the State shall be combined with another county or counties to form a representative area of not less than seven-tenths of one percent of the population of the State. Any county which is isolated under the initial allocation as provided in this section shall be joined with that contiguous representative area having the smallest percentage of the State's population. Each such representative area shall be entitled initially to one representative.

"After the assignment of one representative to each of the representative areas, the remaining house seats shall be apportioned among the representative areas on the basis of population by the method of equal proportions.

"Any county comprising a representative area entitled to two or more representatives shall be divided into single member representative districts as follows:

"(1) The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the representative area by the number of representatives to which it is entitled.

"(2) Such single member districts shall follow city and township boundaries where applicable and shall be composed of compact and contiguous territory as nearly square in shape as possible.

"Any representative area consisting of more than one county, entitled to more than one representative, shall be divided into single member districts as equal as possible in population, adhering to county lines."

tionment commission would have any significant discretionary authority, he could not have read, with any understanding, the proposed constitution's article 4 language, the Address to the People or the Preface thereto.   Furthermore, if there were any astute electors who believed, as some most certainly did, that the 80–20 formula and the .7% formula ultimately would be declared constitutionally invalid, but who nonetheless voted for the proposed constitution that first Monday in April of 1963, it hardly can be suggested seriously that they would have believed or intended that the legislative apportionment commission nonetheless would survive such declaration of unconstitutionality in order to preside over the apportionment of the legislative power of this State guided only by the Federal constitutional language of equality which had not then yet been defined judicially with regard to its applicability to legislative apportionment by any court with authority in this State.

In short I do not believe the people of this State would have delegated the apportionment of legislative power to commissioners, neither elected by the people nor selected by any of the people's elected representatives but, instead, selected by the state organizations of the major political parties, except for the fact that the proposed constitution permitted those commissioners to function only within rigid limitations imposed by constitutionally stated mathematical formulae.   Nor can I believe that the people of this State would have intended that, in the event the mathematical formulae were declared unconstitutional, the commissioners selected by the political parties would be empowered to allocate the legislative power of the State on the basis of a then undefined Federal constitutional standard of equality.

For these reasons, it was my judgment in 1964, as it is now, that the legislative apportionment commission no longer exists as a constitutional body exercising powers under article 4 of the Constitution of 1963.

The legal effect of what this Court did in 1964 was to require the legislative elections of that year "to be conducted in districts set forth in the alternate Austin-Kleiner plan and the State's legislative power to be apportioned as provided therein, not pursuant to any of the provisions of section 6 of article 4 of the Constitution of 1963, but rather in exercise of this Court's general equitable power to provide by judicial decree a provisional legislative reapportionment pending valid legislative or constitutional enactments providing for periodic reapportionment." 373 Mich 250, 261, 262. In the interim, however, no action has been taken, either by the legislature elected pursuant to that alternate Austin-Kleiner plan or by the people of this State, to adopt legislation or to amend the Constitution of 1963 to provide for a permanent valid plan for periodic reapportionment. As I view the current situation, it is too late, as a practical matter, for the people to initiate either corrective legislation or constitutional amendment. See the requirements for popular initiative of legislation in section 9, article 2, and for constitutional amendment by petition of the people in section 2 of article 12.

Therefore, unless the legislature itself acts promptly to provide by legislation or by constitutional amendment for legislative reapportionment at the very least for the 1966 election, there will be no valid legislative districts for that election excepting only as this Court might be required to exercise again its general equitable powers to provide another provisional legislative reapportionment plan for one year (as was judicially ordered for New

York and affirmed on October 11, 1965 by the United States Supreme Court in *WMCA, Inc.,* v. *Lomenzo,* 382 US 4 [86 S Ct 24, 15 L ed 2d 2]; *Travia* v. *Lomenzo,* 382 US 9 [86 S Ct 49, 15 L ed 2d 10]; and *Screvane* v. *Lomenzo,* 382 US 11 [86 S Ct 90, 15 L ed 2d 15]), or for two years (which was the legal effect of what this Court did in 1964) or for such other period as this Court may determine necessary to permit adoption of an appropriate law or constitutional amendment and election of a legislature thereunder.

Under the best of circumstances, little time remains for legislative action. Whatever is done, be it by statute or by constitutional amendment, it must be effective at least seven weeks before the August 2, 1966, primary, by which time candidates for nomination to legislative office must qualify. CLS 1961, § 168.534, as amended by PA 1963 (2d Ex Sess), No 57 (Stat Ann 1965 Cum Supp § 6.1534), and CLS 1961, § 168.551, as amended by PA 1963 (2d Ex Sess), No 57 (Stat Ann 1965 Cum Supp § 6.1551). If the legislature undertakes to accomplish this current task of reapportionment by constitutional amendment, two-thirds of the members elected to and serving in each house must agree upon any such proposed constitutional amendment and such proposal must be submitted to the electors, in this instance because of time necessity, at a special election to be held not less than 60 days after agreement by the legislature and at least 45 days before the amendment must become effective if it is to apply to the 1966 primary and general election. See section 1, article 12, Constitution of 1963.

While it may be argued that statutory action effectively is precluded by this Court's 1964 decision in which the legislative apportionment commission

is treated "as if" it continued in legal existence, perforce of constitutional origin and, therefore, beyond statutory command by the legislature, that decision, whether legally right or wrong, is no obstacle to the legislature's proposal of a constitutional amendment to rectify the egregious errors made by the Constitutional Convention of 1963 and by the people themselves in adopting the Constitution of 1963 with its invalid article 4 provisions. Sooner or later a constitutional amendment must be adopted to provide Michigan with a permanent method for periodic legislative reapportionment, hopefully one which will not again regularly inject the judiciary into what is essentially a legislative function of government (*Reynolds* v. *Sims* [1964], 377 US 533 [84 S Ct 1362, 12 L ed 2d 506]) excepting only in performance of the judiciary's traditional role of adjudicator of litigation between contesting parties. Until such a constitutional amendment is adopted, it should be evident from these current opinions that this Court will be decreeing legislative apportionment annually or biennially. Unless such a constitutional amendment is adopted promptly, this Court will have to prescribe a plan of legislative apportionment for 1966, either by resort to what I consider legally improper reference back to the commissioners designated by the major political parties pursuant to section 6 of article 4 or by exercise again of our general equitable powers in order to avoid disruption of the legislative process.

As indicated in the forepart of this opinion, I would deny the relief requested by petitioners. They have proceeded under section 6 of article 4 of the Constitution of 1963, a provision no longer valid. Furthermore, petitioners' principal claim against the alternate Austin-Kleiner plan, adopted by this Court in 1964, is that it comprises a political gerrymander. Because I view our 1964 action, as I did when it

was taken, as merely a judicial decree of provisional reapportionment for that year's legislative elections[4] without commitment to further judicial decree of its use in future elections in the event appropriate statutory action or constitutional amendment were not accomplished, such claims of political gerrymander need not be considered by this Court. Notwithstanding the foregoing, I would not dismiss the proceedings. I would, instead, treat the petition as one seeking to invoke our general equitable power to provide by judicial decree a provisional legislative reapportionment for the year 1966 or until adoption of valid statutory or constitutional enactments providing for periodic legislative reapportionment. In order to accord the legislature time within which to take corrective action such as indicated above, I would adjourn further proceedings in this matter until February 15, 1966, or until the further order of this Court.

---

4 While both Justices BLACK and O'HARA now read our second order of June 17, 1964 as providing a legislative reapportionment plan only for the year 1964, there is no basis in that order for such a reading. The order purports to be entered under paragraph 7 of section 6 of article 4, which paragraph contemplated adoption of a plan to be used in every legislative election thereafter until the succeeding decennial reapportionment. Furthermore, the order specifically provides that any plan adopted pursuant thereto would be subject to the judicial review provided by the eighth pararaph of section 6, article 4, but, because of time limitations, the order provided that such review under paragraph 8 would not affect the plan's use in the 1964 election. Unless that decretal language was merely doubletalk, it surely meant that any plan adopted would be subject to paragraph 8 review, but only with regard to use of the plan in elections subsequent to 1964. If the plan to be adopted pursuant to that order of July 17, 1964, were intended by the Court's majority only for use in 1964, as now suggested by my Brethren, then why did they provide for review thereof, but only after the 1964 election? Indeed, where in paragraph 7 of section 6 of article 4, pursuant to which they purported to be acting, is the Court given any right to order a plan adopted for one year only? Such right exists only in the exercise of our general equitable powers, but those powers could be exercised by the Court only after a finding that section 6 was constitutionally invalid. That is precisely what I urged the Court to find in April (372 Mich 418, 461–469) and in June (373 Mich 250, 257–262) of 1964 and what I again urge upon the Court.

Smith, J. (*for dismissal of petition*). The opinion of Mr. Justice Kelly comprehensively details the original positions[1] of the respective parties. The gist of petitioners' claim, seen most plainly from the offer of proof, is that the apportionment plan ordered by this Court discriminates against partisan voters of one party in favor of partisan voters of another party. The claim is one of gerrymandering, or design of representative districts for partisan advantage. Petitioners sum up their "essential position" as follows:

"Article 4 of the Michigan Constitution of 1963 contains a number of State standards. *Reynolds*[2] and its companion cases *nullified two of those standards* (80–20 and .7 per cent). *The remaining State standards survive* and are important to the people of Michigan. Although these standards survive, *Reynolds* imposes restrictions upon their application in order to give effect to the equal protection clause. The Federal and State equal protection clauses are, for purposes of this litigation, coequals.

"The requirements of these clauses are flexible, not rigid; and they do not require complete annihilation of the remaining State standards. Both can be given proper effect. Neither should extinguish the other. Accordingly, it is our position that the State standards should be applied to the greatest extent permitted by the equal protection clauses, as indicated in our briefs and in argument before this Court. This the Austin-Kleiner plan fails to do." (Petitioners' surrejoinder brief.) (Emphasis supplied.)

Predicated upon this "essential position", petitioners seek the following relief: (1) that the plan ordered adopted by this Court and pursuant to which

---

[1] Cf. Petitioners' original position with the summary of "essential position" quoted above.

[2] *Reynolds* v. *Sims,* 377 US 533 (84 S Ct 1362, 12 L ed 2d 506).— Reporter,

the present legislature (house and senate) was elect-
ed in November 1964 be declared void for any future
elections, and (2) that the plan be remanded to
the apportionment commission "with a proper state-
ment of standards to be followed in preparation of
a revised plan", or, in the alternative (3) petitioners
be permitted to present proofs that the apportion-
ment commissioners and their helpers, advisers, and
assistants had the intent to gerrymander legislative
districts, and that this indeed was accomplished by
the use of prior election results showing partisan
distribution in various political subdivisions of the
State.

I am unable to agree with any disposition of the
petition which would declare the plan void and/or
remand the plan to the apportionment commission
or send the case to the Ingham circuit court for
proof-taking.

It is well to reiterate what we are doing in this
paragraph 8 proceeding.[3]  Said paragraph reads in
pertinent part as follows that "Upon the application
of any elector  *  *  *  the Supreme Court, *in the
exercise of original jurisdiction,  *  *  *  may* re-
view any final plan adopted by the commission, and
shall remand such plan to the commission for fur-
ther action *if it fails to comply with the require-
ments of this Constitution.*"  (Emphasis supplied.)
Obviously, a remand is required only if the Court
first finds that the plan previously adopted fails to
comply with the requirements of "this Constitution",
as that phrase may be interpreted.  Also, quite ob-
viously, we are not required to remand the plan
to the commission for a determination *if* the plan
measures up to constitutional requirements, nor for
the purpose of determining *if* the commission can
draw a better, nicer, or less controversial plan.  Any

_____

[3] Const 1963, art 4, § 6, par 8.—REPORTER.

remand must be predicated upon a finding that the plan fails to comply with constitutional requirements.

Two other preliminaries ought to be disposed of at the outset, too. One is that the plan ordered adopted by this Court must certainly bear the presumption of constitutionality. This is not only elemental law but also good common sense in this particular situation. This Court and the apportioning commission spent nearly the entire late winter and early spring of 1964 immersed in every conceivable kind of plan and proposal, preliminary to the order resulting in the present plan. Much of what is presently claimed by the petitioners was reviewed in simple substance before entry of the final order. If anything should bear a presumption of constitutionality, then it is the present plan.

The last preliminary item is that the burden of proof is on petitioners to show unconstitutionality. This, too, is elemental. In present context, it means that this petition must allege facts plainly showing that the plan is unconstitutional.

Assuming all well-pleaded facts to be true, for the purpose of this proceeding, I think the petition fails and should be dismissed. As before mentioned, the gist of petitioners' claim is that the plan was gerrymandered for partisan purposes. In this connection, petitioners say that, conceding *Reynolds* v. *Sims* wiped out the 80–20 and .7 per cent provisions of the apportionment formulae, certain "antigerrymandering" standards remain. It is these standards which petitioners claim the plan has ignored and which results in its invalidity.

The single most important question is that of severability and I think, therefore, that we should speak forthrightly about it; severability is, after all, a State question, not a Federal question. *Guinn* v. *United States,* 238 US 347 (35 S Ct 926, 59 L ed

1340).  Reiterating, petitioners concede that the
80–20 provision of the senate formula and the .7
per cent (moiety) clause of the house formula do not
survive *Reynolds*.  "However", petitioners say, "Ar-
ticle 4 of the Michigan Constitution of 1963 contains
other standards which petitioners contend are valid
standards which do not deprive persons of equal
protection of the laws.  These standards are:  (1)
the adherence to county and other political sub-
division boundary lines, (2) the division of counties
into classes, (3) the use of the method of equal pro-
portions, (4) the preservation of existing senate
districts at the time of reapportionment, (5) require-
ments of compactness, contiguity, convenience, and
uniformity of shape."

These "standards" are *not* severable from the
80–20 and .7 per cent provisions of the apportion-
ment formulae for house and senate.  This can be
seen most clearly from reading the reasonably brief
sections of article 4 of the Michigan Constitution of
1963, quoted fully in the margin of Justice SOURIS'
opinion.  One part of each formula complements the
other; neither stands in isolation.  Each was de-
signed to be mandatory for area and population
situations as applicable.  The apportionment article
of our Michigan Constitution thus had no discre-
tionary features.  And short of writing a new ap-
portionment article by judicial interpretation, we are
likewise in no position to say under what conditions
the various standards may apply.  It is not for
the Court to say which standards must be obeyed and
which may be ignored.  Once the 80–20 and .7 per
cent provisions have fallen, is this Court to make
rules as to what remaining standards hold priority
over others?  Would the preservation of existing
(prior to 1964) senate districts take precedence over
contiguity?  Absent 80–20 and .7 per cent provisions,
can we make a true division of counties into classes?

The answers are obvious and demonstrate in brief the interdependence and nonseverability of standards in the apportionment formulae. The results that could be anticipated from the "flexible" operation of such standards, for which petitioners contend, would be wholly foreign to the article 4 apportionment scheme as proposed by the Constitutional Convention and adopted by the people. This, by analogy, is in plain violation of a basic canon of construction that where provisions found to be unconstitutional are of such key significance that to follow remaining provisions would operate to defeat the intent of the lawmakers, then the entire operative section must also fall. *Connolly* v. *Union Sewer Pipe Co.,* 184 US 540 (22 S Ct 431, 46 L ed 679), *People* v. *Sperry & Hutchinson Co.,* 197 Mich 532. This in no way suggests that other portions of article 4 are not severable. The point is that only the apportionment schemes for house and senate are rendered invalid by *Reynolds* v. *Sims.*[4]

Once it is concluded that *Reynolds* excised entirely the apportionment formulae of article 4 because of the nonseverability of interdependent provisions, we have the question of the validity of the Austin-Kleiner alternate plan which was adopted by the commission on order of this Court. The question seems to be raised of whether proponents of the plan, and this Court, were too religious in following the mandate of *Reynolds* v. *Sims.* I should hope not. Surely everyone must agree that the central holding of *Reynolds* is that both houses of a legislature *must* (not may) be apportioned on a population basis with all districts to be of equal population, as nearly as practicable. Permissively, the several States *may* provide for some deviations

---

[4] That is, section 2, except paragraph 1 thereof, and section 3, except paragraph 1 (and deleting the last sentence) and sections 4 and 5, all of article 4.

from the principle by giving representation to various political subdivisions and may provide for compact districts of contiguous territory if substantial equality is maintained. But the problem of designing new apportionment criteria consonant with *Reynolds* v. *Sims* and companion cases, employing various standards in permissible deviation from the population principle, is neither the province of this Court nor of the apportionment commission. It is more properly within the province of the people, to be accomplished by appropriate amendments to the Michigan Constitution.

In the meantime, the strict mandate of *Reynolds* should be followed strictly. What the present plan does is to follow the unavoidable mandate of *Reynolds* by apportioning on the basis of population districts as nearly equal as practicable. The proponents of such plan have employed, and we have approved, certain equitable, common-sense standards, similar in some respects to certain of the "standards" in the apportionment formulae of article 4. We said in the adopting order:

"Subject to this controlling objective of substantially equal population, and to the extent it would not be subordinated, districts by such plan are formed as *compact, contiguous, and regular in shape, and do follow county, city, and township boundaries as nearly as practicable.*" *In re Apportionment of State Legislature—1964,* 373 Mich 250, 254. (Emphasis supplied.)

These equitable, common-sense standards of compactness, contiguity, regularity, and boundary-following are not provisions severed from the apportionment formulae, as I have said, but are the normal and reasonable standards which should be followed in any apportionment scheme, where possible. But that the proponents of the plan sought to follow

these standards was fortuitous and not required by *Reynolds*.

I do not read *Reynolds* as requiring or mandating such standards, because in discussing similar standards, *Reynolds* uses the permissive "may", over and over again. It says that *States may* employ such standards. This is in contradistinction to the mandatory language employed in the essential holding of *Reynolds*:

> "We hold that, as a basic constitutional standard, the equal protection clause requires that the seats in both houses of a bicameral State legislature *must* be apportioned on a population basis." *Reynolds* v. *Sims,* 377 US 533, 568. (Emphasis supplied.)

I think, therefore, that because the present plan follows the essential mandate of *Reynolds* v. *Sims* in making districts as nearly equal as practicable, it is in conformity with the requirements of the Constitution. It is valid and should not be tinkered with. Depending upon one's point of view, a "better" plan can always be drawn, but this is little reason for again disturbing the geographical makeup of districts.

Petitioners say, however, that even if the standards are found to be nonseverable the plan is invalid because it is in violation of the due process and equal protection clauses of the Constitution. The first reason, they say, is that it "fragmentizes certain communities, thus denying fair and effective representation to the residents thereof." The trouble with this argument is that it has one standard for non-populous areas and another for the metropolitan areas. Examples given in support of the argument are from out-State areas; no mention is made of the absolute necessity of dividing up the city of Detroit and other large cities into several representative districts. I do not understand the argument

that larger cities may be divided up but not smaller cities and other political subdivisions. I quite agree that, consonant with the principle of population representation, all existing boundaries should be maintained. This is precisely what we found the plan accomplished.

Gerrymandering is really the thrust of petitioners' claim. They are aggrieved that the districts, although as nearly equal as practicable, allegedly are designed to maximize the representation of members of one party and minimize those of the other major party. This has always been and will continue to be a serious issue, especially with loyal partisans. It is only minimally the question of which set of officeholders predominate, but to a considerable degree it involves the projection of principles from the party platform into the realities of the body politic. Obviously, this is an extraordinarily sensitive area for any court, for almost inescapably to rule in favor of one party's position is to rule against the other. No wonder there is a dearth of decisions in this precise category.

The only holding, as distinguished from *obiter dicta,* which we have been able to find is in the case of *WMCA, Inc.,* v. *Lomenzo* (DC SD NY, 1965) 238 F Supp 916. In this case, plaintiffs tended to show that one of the plans adopted by the legislature of the State of New York was in violation of the Fourteenth Amendment as being gerrymandered for partisan political advantage. A three-judge Federal district court held that the claimed gerrymandering did not render the New York apportionment plan in violation of the Fourteenth Amendment where the alleged gerrymandering was not based on race, color, or previous condition of servitude and did not produce districts of unequal population. In discussing the impact of *Reynolds* v. *Sims,* the court had this to say (p 626):

"In short, *Reynolds* v. *Sims* concerned arithmetic and not geometry.

"Since plaintiffs have neither argued nor proved that the alleged political gerrymandering has produced districts of unequal populations, this suit does not come within the purview of *Reynolds* v. *Sims*. It is true that the opinion in that case treated partisan gerrymandering as an evil which a State may legitimately seek to preclude. *Id.* at 578, 579, 581 (84 S Ct 1362, 12 L ed 2d 537, 538). But *Fortson* v. *Dorsey,* 379 US 433, 439 (85 S Ct 501, 13 L ed 2d 405), makes it clear that the Supreme Court has refrained from condemning partisan gerrymandering as unconstitutional."

Just recently, October 11, 1965, the United States Supreme Court affirmed the judgment without opinion. However, in a special concurrence, Mr. Justice Harlan had this to say:

"In *WMCA, Inc.,* v. *Lomenzo,* 238 F Supp 916, the three-judge court found that plan A satisfied this order; in so doing it rejected contentions that apportioning on a basis of citizen population violates the Federal Constitution, and that partisan 'gerrymandering' may be subject to Federal constitutional attack under the Fourteenth Amendment. In affirming this decision, this Court necessarily affirms these two eminently correct principles." *WMCA, Inc.,* v. *Lomenzo,* 382 US 4 (86 S Ct 24, 15 L ed 2d 2).

I doubt whether this represents the final chapter in rulings concerning partisan political gerrymandering, but the quoted case must certainly stand for the general proposition that in circumstances so far presented to the United States Supreme Court, it has not found that such gerrymandering has presented a reviewable Federal constitutional question. The dicta in *Reynolds* seems to indicate a disposition on the part of that Court to leave it to the States

to develop and apply rational apportionment schemes which could make partisan gerrymandering difficult, for the Court observes in *Reynolds,* at page 578:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. *Indiscriminate districting,* without any regard for political subdivision or natural or historical boundary lines, *may be little more than an open invitation to partisan gerrymandering."* (Emphasis supplied.)

Partisan gerrymandering presently presents no Federal question, and it is clearly suggested that States are free to develop antigerrymandering standards. As I have already indicated, the development of such standards *in a rational apportionment scheme* is not the province of this Court.

Petitioners' due process argument must be rejected out of hand. It contends that this Court failed to follow fair procedures in ordering the plan adopted. They stress that only 5 days elapsed from the time of *Reynolds* v. *Sims* to a decision by this Court. Such argument patently ignores these facts:

1. The apportionment commission had under active consideration, many months before *Reynolds,* the first Austin-Kleiner plan which was based upon equal population for districts as was the second or alternate Austin-Kleiner plan which this Court ordered adopted.

2. Although the Michigan Constitution of 1963 does not provide for a hearing on the adoption of a plan, this Court allotted 2 full days (March 2 and 3, 1964) to the apportionment commissioners for the presentation of arguments on their respective

plans. At this time, criteria for each plan was fully explored.

3. At the hearing, the Court was advised that in the event additional one-man, one-vote plans were desired for consideration by the Court, same could be supplied "in 24 hours."

The point of all this is that neither this Court nor the apportionment commission came into a consideration of the matter afresh. The fact is that the entire question had been under active consideration for several months. The order of June 22, 1964, directing the adoption of the second or alternate Austin-Kleiner plan was the culmination of many weeks of consideration. I have never heard that the commissioners complained of any "undue haste." I assume that they were as concerned about orderly processes as we were and hence comported themselves in a highly cooperative manner.

Finally, as to the order of June 22, 1964, I must disagree with those of my brothers who say that the order was provisional and adopted only for the primary and general election of 1964. My understanding of it, then as now, is that it was found to be the plan which most accurately complied with constitutional requirements, and for that reason was adopted, not just for the 1964 elections but until such time as it might be shown to be not in most accurate compliance. We anticipated that the plan might be challenged in paragraph 8 proceedings, but the language appearing in the opinion-order which stated that the plan "shall be placed in effect for the primary and general elections of 1964" was adequately explained in the predicate of the selfsame statement, to-wit, that such was being done "irrespective of whether or not said plan shall be challenged upon the application of any elector pursuant to the final paragraph of said section 6 of article 4." The final paragraph is paragraph 8. What we in-

tended by that language was to advise the people
and the legislators that this Court had no intention
of enjoining or otherwise interfering with orderly
election processes, irrespective of whether a para-
graph 8 proceeding might be commenced before the
1964 elections. This was a simple recognition of the
fact that we had already passed the point of no
return for that year, if we contemplated orderly
election processes.

For the reasons given, I vote to dismiss the peti-
tion. I would award no costs.

T. M. KAVANAGH, C. J., concurred with SMITH, J.

November 2, 1965.

Upon due consideration of the respectively sub-
mitted opinions of the Justices, dealing as same
do with the validity as well as present interpretation
and applicability of section 6 of article 4 of the
Constitution of 1963:

ORDERED, pursuant to the specific mandate which
appears in paragraph 8 of said section 6 ("shall
direct the secretary of State or the commission to
perform their duties"), that the commission on legis-
lative apportionment proceed anew with such work
and deliberations as will enable the commission to
district and apportion the senate and house of rep-
resentatives according to now ascertainable as well
as applicable requirements of the Federal Constitu-
tion and of the Michigan Constitution.

ORDERED FURTHER:

1. That the commission complete the work thus
required of it within 60 days from and after the
date of this order.

2. In event of another deadlock of the commission, continuing through expiration of such 60-day period, that the secretary of the commission report promptly to this Court with petition for entry of such further mandatory order as the Court may, at the time, choose to enter pursuant to its broad powers as on mandamus to a State officer.

3. That the Court retain jurisdiction over and with respect to the present proceeding until the requirements of paragraph 8 of said section 6 have been completely fulfilled, including review by this Court, if then necessary, of any final plan which the commission may adopt, and including retention of power to remand any such plan to the commission for further action if, upon final hearing aided by such depositions as may be taken pursuant to future order or orders, it is determined by the Court that such final plan fails to comply with all controlling constitutional requirements.

John R. Dethmers

Harry F. Kelly

Eugene F. Black

Michael D. O'Hara

I concur with all of the above order except numbered paragraph 3 with which I do not agree.

Paul L. Adams

Chief Justice Kavanagh and Justices Souris and Smith dissent from entry of the foregoing order, not alone because of the views expressed in the opinions herein each signed, but in addition for the reason that the majority's order requires the commission to devise a plan of reapportionment of leg-·

islative power in accordance with standards not defined in any one of the four opinions signed by the aforesaid majority of five Justices of the Court.

THOMAS M. KAVANAGH

THEODORE SOURIS

OTIS M. SMITH

SUPPLEMENTAL OPINION (filed November 20, 1965).

BLACK, J.   Since our opinions released November 2d have been viewed publicly by some members of the constitutional commission as having failed to provide expected "guidelines," I deem it in order that this addendum be filed and distributed immediately to members of the commission and to all presently involved counsel.

The guidelines, said to be lacking, were promulgated by supreme authority when the apportionment decisions of 1964 were handed down (June 15, 1964; *Reynolds* v. *Sims* through *Lucas* v. *Forty Fourth General Assembly of Colorado*, 377 US 533–765 [84 S Ct 1362–1489, 12 L ed 2d 506–652]).   Justice ADAMS reviewed these guidelines with due accuracy in his opinion filed November 2d.   Had it not been for disagreement of interpretation with respect to one part of paragraph 8 of section 6, one of us believing that the Court as yet has no "final plan" before it to "remand," (376 Mich 442 *et seq.*) and the other concluding "that this matter should be remanded," (376 Mich 454) I could and would have indorsed Justice ADAMS' said opinion.

To make sure that members of the commission understand that at least two members of the Court are in agreement that the mentioned apportionment

decisions provide all guidelines needed by the commission, I now record unconditional indorsement of all portions of Justice ADAMS' said opinion, save only the first and final sentences thereof. It is imperative, in my view, that we remember at all times that "remand" under paragraph 8 is due and proper only when the commission has, by its own independent action, adopted a "final plan," that such plan has been brought before the Court in pursuance of original proceedings, and that the plan has been found by the Court as failing to comply with constitutional requirements.

This last was made explicit by paragraph "3" of the order which, shortly after release of our opinions on November 2d, was signed by Justices DETHMERS, KELLY, O'HARA and the writer.